# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-00866-SCT

*JUSTIN UNDERWOOD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/95 |
| TRIAL JUDGE: | HON. JOHN B. TONEY |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EDWARD BLACKMON, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | JOHN KITCHENS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 2/12/98 |
| MOTION FOR REHEARING FILED: | 2/26/98 |
| MANDATE ISSUED: | 4/16/98 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

### PART ONE: GUILT PHASE

¶1. Justin Underwood was indicted for capital murder by the grand jury for Madison County during the March Term of 1994. The indictment charged that Underwood had murdered Virginia Ann Harris on or about February 15, 1994, by shooting her with a pistol, during the course of kidnapping, in violation of Miss. Code Ann. § 97-3-19(2)(e). Underwood pleaded not guilty and proceeded to trial on May 22, 1995, in the Circuit Court of Madison County. The jury returned a verdict of guilty on the charge of capital murder on May 24. The sentencing phase of the trial was held on the following day, and the jury found that Underwood should be sentenced to death. Circuit Judge John B. Toney entered the final judgment of conviction and sentence on May 25, and ordered that Underwood be put to death by lethal injection on July 7, 1995. Following denial of his motion for judgment

notwithstanding the verdict, or in the alternative for a new trial, Underwood perfected his appeal to this Court.

## STATEMENT OF THE FACTS

¶2. On February 15, 1994, Lindsay Harris spoke with his wife, Virginia Ann Harris, before leaving their home in Flora to travel to his produce business at the Farmer's Market in Jackson. Mrs. Harris asked her husband to eat dinner in Jackson on his way home from work, because she planned to do some shopping in Jackson that day. Mr. Harris agreed, told his wife goodbye, and left for work at about 6:00 a.m. He worked from 6:30 a.m. until closing time at 4:00 p.m., when he loaded a delivery order in his truck and left for Flora at about 4:30 p.m.

¶3. When Mr. Harris arrived at his house, he saw his wife's car, a blue Lincoln Towncar, in the garage, but when he entered the home and called her name, there was no answer. He noticed that the lights and television were on in the den, and the curtains were drawn. Walking back to their bedroom, Mr. Harris saw that Mrs. Harris's makeup drawer was pulled open, the lights were on, and a makeup bottle was left upside down on the counter. Mr. Harris and his son Kyle both testified that it was unlike Mrs. Harris to leave the house in such a condition.

¶4. At about 5:00 p.m., Mr. Harris changed clothes and left to go feed his cattle. When he returned, Mrs. Harris still wasn't home. He showered and dressed for bed, and by 8:00 p.m. he was extremely worried about his wife. He started calling family and friends, but no one knew where she was. At midnight Mr. Harris called the police and reported Mrs. Harris as a missing person. At 12:30 or 1:00 a.m., Officer Ogden Wilson arrived at the Harris home and filled out a missing person report, which he forwarded to the sheriff's department.

¶5. At 1:30 a.m. Mr. Harris called his son Kyle and told him that Mrs. Harris was still missing. Kyle came over immediately, and the two conducted a search of the house and yard. On their way back into the house through the garage, Kyle noticed that the keys to Mrs. Harris's Lincoln were in the ignition. They also discovered Mrs. Harris's purse on the floor of the front passenger side of the car, which was not Mrs. Harris's custom. Kyle testified that his mother normally kept her purse on the seat beside her. There was no money in the purse, which was unusual for Mrs. Harris, who usually carried at least $40 with her at all times. The only unlocked car door was the driver's door, indicating that only one person had exited the car, because when the ignition was turned, all of the doors automatically locked. The front seat of the car was pushed back to its furthermost position, which was also out of character for Mrs. Harris. Mr. Harris testified that he was 5'9", and his feet didn't touch the pedals in Mrs. Harris's car with the seat that far back. Charles Scarborough, Master Sergeant Trooper with the Mississippi Highway Patrol, testified that he was 5'11" and would not be comfortable with the seat in that position. Mr. Harris also testified that he believed the Lincoln was parked in the garage differently than Mrs. Harris usually parked it. Nothing was missing from the house, other than possibly some cash from Mrs. Harris's purse. At this point, Mr. Harris and Kyle agreed that Mrs. Harris must have been kidnapped.

¶6. At 6:00 a.m. on February 16, the highway patrol, police, and sheriff's department were contacted, and detectives began arriving at the Harris home to take over the investigation. Sergeant Scarborough lifted fingerprints and fibers from Mrs. Harris's Lincoln and took pictures of the car. Only two latent prints of value were lifted from the car, and neither were matched with anyone,

including the defendant, Justin Underwood. The fibers taken from Mrs. Harris's car similarly were not linked to anyone, including Underwood. Sergeant Judy Tucker with the Mississippi Highway Patrol Investigation Bureau was called to head up the investigation. Mr. Harris described to Sergeant Tucker the state of the house as he found it on the evening of February 15. He also showed her Mrs. Harris's pill box with two of five pills missing from her February 15 doses, her diet log book showing that she had consumed only two glasses of water on the morning of February 15, and a shopping list left on the kitchen counter of items that Mrs. Harris planned to buy in Jackson on February 15. Based upon the state of the house when Mr. Harris arrived home on February 15, Sergeant Tucker determined that Mrs. Harris had not left the house of her own free will.

¶7. Sergeant Tucker contacted her supervisors for further instructions, and a search of the area was organized, including an aerial search. The investigators discovered that Mrs. Harris had missed her 11:15 appointment at Jenny Craig Weight Loss Centre and her afternoon nail appointment at Mona's Nails in Jackson. Mona's had called the Harris home at 2:30 p.m. on February 15 with no response. With the help of Mrs. Harris's daughter-in-law, Lynette Harris, they determined that Mrs. Harris's red house shoes, blue robe, and a wide black belt were missing.

¶8. Around 4:40 p.m. in the afternoon on February 16, Webb Bozeman informed authorities that two of his employees had seen Mrs. Harris's car backed into a cattle gap on his property on old Highway 49, approximately 1.5 miles from the Harris home, between 9:00 and 10:00 a.m. on February 15. Testimony at trial placed Underwood's car, or one very similar to it, in a driveway near the Harris home on February 15 at approximately 10:00 or 10:30 a.m. Based upon the tip from Mr. Bozeman's employees, Sergeant Tucker and other law enforcement officers went to the cattle gap and began searching. At about 5:10, Officer Donny Spell found a black belt in a fire lane on the Bozeman property near Bozeman Lake. Continuing on around the lake shore, at about 5:20, Sergeant Tucker discovered Mrs. Harris's body, clothed in a blue pleated shirt, black knit pants, and red house shoes. Clumps of grass and weeds were clutched in her hands. Mrs. Harris only had foundation makeup on the right side of her face. At trial, Mr. Harris testified that in more than forty years of marriage, his wife had never left the house without having makeup on or without being properly dressed. After contacting the crime scene unit, Sergeant Tucker accompanied Dudley Bozeman to notify Mr. Harris and his family.

¶9. Mrs. Harris had been shot four times. Two of the bullets did not exit Mrs. Harris's body, and these were sent to the Mississippi Crime Lab for testing following the autopsy. One bullet traveled from her back through her right lung, diaphragm, and liver. A second bullet struck the right side of her back and penetrated her right lung. Dr. Steven Hayne, who performed the autopsy, testified that either of these first two gunshot wounds would have individually caused death due to extensive internal bleeding. A third bullet struck Mrs. Harris's left ear, went through the ear, struck and went through the left side of her neck, and struck her front right shoulder. Dr. Hayne testified that this gunshot would not have caused death by itself. The fourth bullet entered the front of Mrs. Harris's left arm and exited the inner arm. This gunshot wound was also nonlethal. All four of the gunshot wounds were distant, meaning that the shots were fired more than 1½ to 2 feet away, and they occurred at or about the same time. The angles of the gunshot wounds were consistent with Mrs. Harris being on her knees and the shooter standing behind her. Dr. Hayne testified that the manner of Mrs. Harris's death was homicide, and that it would have taken a minimum of fifteen to twenty minutes for Mrs. Harris to die from her wounds.

¶10. When Mrs. Harris's body was discovered, rigor mortis had set in, indicating that Mrs. Harris had been dead for at least two hours, but no more than forty eight hours. Fly larvae, or maggots, were in both of Mrs. Harris's ears, indicating that she had been dead for at least twelve to twenty four hours. Based upon Sergeant Tucker's testimony that the body was discovered at about 5:20 p.m. on February 16, and Mr. Harris's testimony that he saw his wife alive at about 6:00 a.m. on February 15, this evidence would place the time of death between approximately 6:00 a.m. on February 15, and 5:20 a.m. on February 16. One of the Harris's neighbors, Bill Richardson, testified that he heard three gunshots near Bozeman Lake around 10:15 or 10:20 a.m. on February 15.

¶11. In late January or February of 1994, Charlie Palmer, Justin Underwood's uncle, discovered that some items were missing from his home, including his pistol and some tools. Mr. Palmer spoke with Chief Deputy Hubert Roberts of the Madison County Sheriff's Department about the stolen items, but did not file an official report, because he thought that his ex-wife might have used the spare keys to enter his home. Mr. Palmer decided to check his nephew's home to find out if Underwood had taken the items. Underwood let his uncle search his car, a light yellow Oldsmobile Cutlass, in which Mr. Palmer found his tools and his pistol. On March 7 or 8, Mr. Palmer went to see Deputy Roberts again, and this time Deputy Roberts filled out a report on the items that Mr. Palmer had discovered were missing over the last month. Included in this report was the RG blue steel .32 caliber revolver, serial number 0207090, that Mr. Palmer had recovered. Although Mr. Palmer was somewhat confused about exactly when he noticed that his pistol was missing, he was certain that it was missing before March 7 or 8, when he gave this report to Deputy Roberts. The statement says that the pistol was missing in late January or early February.

¶12. When Mr. Palmer gave his statement to Deputy Roberts, he also turned over the pistol and the box of .32 caliber revolver bullets that he used with the gun to the deputy. Deputy Roberts then wrote down the gun's serial number and gave the pistol and bullets to Sergeant Tucker on March 8. No attempts were made to lift fingerprints from the gun, because it had already been handled by Charlie Palmer and Deputy Roberts before he handed it over to Sergeant Tucker. However, Steve Byrd, a forensic scientist specializing in firearms examinations at the crime lab, concluded from his examination that the bullets taken from Mrs. Harris's body were fired from Charlie Palmer's pistol. His conclusion was corroborated by the findings of a second analyst who initialed Byrd's report.

¶13. On March 9, Deputy Roberts arrested Underwood for the burglary of Charlie Palmer's residence. Later that afternoon, Underwood gave his statement to Terry Barfield, an investigator with the Madison County Sheriff's Office, and W.H. Hathcock with the Mississippi Highway Patrol. In his statement, Underwood admitted to breaking into Charlie Palmer's home on February 5 and taking items, including the pistol that Charlie Palmer retrieved from Underwood's car on March 7.

¶14. The next day, March 10, Underwood gave another statement to Officer Barfield and Investigator Larry Saxton in which he admitted to killing Mrs. Harris by shooting her at Bozeman Lake. However, he stated that Mrs. Harris had asked him to kill her because her husband had given her AIDS. Both parties stipulated at trial that Mrs. Harris never had AIDS or HIV. Evidence was presented at trial showing that Mrs. Harris was taking amitriptyline, a medication commonly prescribed for depression. However, Mrs. Harris had undergone a radical mastectomy, so it wouldn't be unusual for her doctor to prescribe an antidepressant. Dr. George Allard, Mrs. Harris's primary

care physician testified that amitriptyline could also be prescribed for an intestinal tract problem, which would be consistent with Mrs. Harris's medical history.

¶15. According to Underwood's March 10 statement made to Officers Barfield and Saxton, Mrs. Harris saw Underwood drive by on February 15 and waved for him to come to her house. Mrs. Harris knew Underwood, because he had done some yard work for her. When he came into the house, Underwood said that Mrs. Harris asked if he had a gun, so he went and got it out of his car, and she offered him money to kill her. Underwood stated that she drove them to the cattle gap, where they got out of the car and walked to the lake, stopping periodically for Mrs. Harris to catch her breath. He said that Mrs. Harris got down on her knees and started praying, so Underwood got down on his knees, and then Mrs. Harris said, "Do it." Underwood got up, closed his eyes, and shot the pistol six times. The pistol was the same one that he had taken from Charlie Palmer's house. Then he left Mrs. Harris lying on the ground, drove her car back to her house, and left in his own car.

¶16. After presenting the foregoing evidence, the State rested its case. The defense rested without calling any witnesses. Following closing arguments and jury instructions, the jury convicted Underwood of capital murder. At the close of the sentencing phase, the jury found that Underwood should be sentenced to death.

## STATEMENT OF THE LAW

## I.

## THE TRIAL COURT ERRED IN REFUSING TO QUASH THE INDICTMENT ON THE GROUND THAT JUSTIN UNDERWOOD IS AT THIS TIME AND WAS AT THE TIME OF THE COMMISSION OF THE OFFENSE SUFFERING FROM INSANITY.

¶17. On May 18, 1994, Underwood filed his Motion for Appointment of Psychiatrist, alleging that Underwood exhibited signs of mental incompetency. In the motion, Underwood requested a mental examination to determine whether he was competent to stand trial and whether at the time of the crime he possessed the mental capacity to distinguish right from wrong. The State filed a motion on July 15, 1994, requesting that the trial court order a psychiatric evaluation of Underwood at Whitfield. That same day, Circuit Court Judge R.L. Goza ordered that Underwood be examined at Whitfield to determine whether he was competent to stand trial. On April 5, 1995, Underwood filed his Motion to Quash Indictment based upon insanity and his Motion for Separate Trial on Issues of Criminal Responsibility and Innocence. In the second motion, Underwood requested that a separate trial be held before the trial on guilt for Underwood to assert his insanity defense. Judge Toney heard arguments on these two motions and Underwood's Motion for Appointment of Psychiatrist at a pre-trial hearing on April 5.

¶18. The April 5 hearing transcript reveals that Underwood was examined by Dr. Lott at Whitfield. According to Dr. Lott's report, Underwood was able to assist his attorney, knew right from wrong and was capable of standing trial. As of April 5, 1995, Underwood had not been examined by any other psychiatrist. Judge Toney determined that Underwood's Motion for Appointment of Psychiatrist should be granted and ordered that Underwood be evaluated by a psychiatrist at the Region 8 Mental Health Center of Madison County. The judge decided to hold his decision on the motion for a separate trial in abeyance until a later time, and he decided to make his decision on

Underwood's motion to quash the indictment after his decision on the separate trial issue. Although no orders on these two motions appear in the record, apparently Judge Toney decided to deny both motions. There is no mention of any further evaluation by a second psychiatrist or any other evidence regarding Underwood's mental capacity in the record before this Court. Underwood did not raise the issue of his mental capacity in his Motion for Judgment Notwithstanding the Verdict Or, In the Alternative, Motion for New Trial.

¶19. Underwood now argues on appeal to this Court that the trial court committed reversible error by denying his motion to quash the indictment based upon mental incompetence due to insanity. He asserts that he did not appreciate the nature or seriousness of the charges against him, lacked the requisite level of intent, and was unable to offer meaningful assistance to his defense counsel. Underwood cites no cases in support of his argument, merely asserting that failing to quash the indictment violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution.

¶20. The State argues that we need not consider this issue due to Underwood's failure to cite supporting authority. They also claim that this issue is waived, because Underwood did not raise mental incompetence as an issue in his motion for a new trial, because no testimony on Underwood's alleged mental problems was offered at trial, and generally because the record is insufficient to respond properly to Underwood's claim.

¶21. Underwood's brief allots only two short paragraphs of argument in support of this assignment of error. He cites no authority in support of his argument. We have held that "issues unsupported and not argued are abandoned and need not be considered." *Thibodeaux v. State*, 652 So.2d 153, 155 (Miss. 1995) (*citing Pate v. State*, 419 So.2d 1324, 1325-26 (Miss. 1982)).

¶22. The State is incorrect in asserting that Underwood has failed to preserve this issue on appeal due to his failure to include the issue in his motion for a new trial. Where an assignment of error is evidenced in the pleadings and transcript, it is not necessary to make a motion for a new trial based upon that error. *Jackson v. State*, 423 So.2d 129, 131 (Miss. 1982). Here, Underwood preserved this issue for appeal by timely filing his motion to quash the indictment based upon insanity and by arguing that motion before the trial judge.

> It is elementary that a party seeking reversal of the judgment of a trial court must present this Court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved. (citations omitted)
>
> *Queen v. Queen*, 551 So.2d 197, 199 (Miss. 1989). This Court "must decide each case by the facts shown in the record, not assertions in the brief. . . ." *Burney v. State*, 515 So.2d 1154, 1160 (Miss. 1987) (quoting *Mason v. State*, 440 So.2d 318, 319 (Miss. 1983)). The burden falls upon an appellant to ensure the record contains "sufficient evidence to support his assignments of error on appeal." *Burney*, 515 So.2d at 1160 (quoting *Robinson v. State*, 345 So.2d 1044, 1045 (Miss. 1977)).

*Hansen v. State*, 592 So.2d 114, 127 (Miss. 1991).

¶23. Aside from any procedural bar, Underwood's claim is not persuasive. Rule 4.08 of the Uniform

Criminal Rules of Circuit Court Practice was in effect at the time of the April 5 hearing on Underwood's competency motions. Rule 4.08 states in pertinent part:

> **(1) Inability to Stand Trial.** If before or during trial the court, of its own motion or upon motion of counsel, has *reasonable* ground to believe that the defendant is insane, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with Miss. Code Ann. § 99-13-11 (1972).
>
> *If the examination determines that the defendant is sane, the court shall proceed to trial.*

U.C.R.C.C.P. 4.08 (emphasis added). Under this rule, a trial court is obligated to order a competency hearing "whenever a reasonable question of the defendant's capacity arises." *Howard v. State*, 697 So.2d 415, 422 (Miss. 1997) (*citing Conner v. State*, 632 So.2d 1239, 1248 (Miss. 1993); *Pate v. Robinson*, 383 U.S. 375 (1966)). "The determination of what is 'reasonable,' of course, rests largely within the discretion of the trial judge. He sees the evidence first hand; he observes the demeanor and behavior of the defendant." *Conner*, 632 So.2d at 1248.

> In any criminal action in the circuit court in which the mental condition of a person indicted for a felony is in question, the court or judge in vacation on motion duly made by the defendant, the district attorney or on the motion of the court or judge, may order such person to submit to a mental examination by a competent psychiatrist selected by the court to determine his ability to make a defense; provided, however, any cost or expense in connection with such mental examination shall be paid by the county in which such criminal action is pending.

Miss. Code Ann. § 99-13-11 (1994). "The rule and the cases interpreting both rule and statute imbue the trial court with great discretion in determining the issue of competency to stand trial." *Addkison v. State*, 608 So.2d 304, 309 (Miss. 1992).

¶24. In *Conner*, this Court held that the trial court did not manifestly err in failing to hold a competency hearing for a schizophrenic defendant who was being treated with medication, even though the defendant had exhibited suicidal behavior and appeared confused during part of the court proceedings. *Conner*, 632 So.2d at 1247-51. We relied on the defendant's psychiatric examination, which revealed that he was competent to stand trial, and the lack of evidence in the record that the defendant was unable to assist his attorney or lacked understanding or appreciation of the proceedings and their significance. *Id*. at 1251. "The Court must assume that the trial court objectively considered all the facts and circumstances, including those which are not available to this Court, which bore upon Conner's competence to stand trial." *Id*. In *Greenlee v. State*, 437 So.2d 1010 (Miss. 1983), we found that the trial court was not even required to order a second psychiatric evaluation after the first evaluation revealed that the defendant was competent to stand trial. *Greenlee*, 437 So.2d at 1012.

¶25. In this case, Judge Toney, upon motions by both the defendant and the State, ordered that Underwood undergo a psychiatric examination. Dr. Lott at Whitfield determined that Underwood was competent to stand trial. However, Judge Toney further ordered that Underwood be examined by another psychiatrist at the Region 8 Mental Health Center of Madison County. The results of that examination do not appear in the record before this Court, but the judge determined that Underwood's trial should proceed. Even if the second psychiatrist's report revealed evidence of

Underwood having mental problems, the trial judge was not unreasonable in refusing to quash the indictment where Underwood apparently failed to bring those findings to the attention of the court. Based upon the record before us, it appears that Underwood did not follow up on any claims of mental incompetency. With no evidence in the record of Underwood being mentally incompetent and only Dr. Lott's report before him declaring Underwood capable of standing trial, Judge Toney did not abuse his discretion by proceeding to trial. By ordering the two psychiatric examinations and reviewing Dr. Lott's report, Judge Toney satisfied the requirements under Rule 4.08 and § 99-13-11. This issue is without merit.

## II.

## THE PROSECUTION'S STRIKES FOR CAUSE OF JURORS BASED SOLELY UPON THEIR VIEWS ON CAPITAL PUNISHMENT SYSTEMATICALLY EXCLUDED BLACKS FROM THE JURY AND VIOLATED JUSTIN UNDERWOOD'S RIGHT TO A FAIR TRIAL.

¶26. Underwood next argues that the State's systematic exclusion of blacks due to their opposition to capital punishment denied him of his rights to due process and equal protection. He claims that the challenges for cause on the basis of anti-death penalty views resulted in exclusion of blacks from the jury. He does not complain about the exclusion of any particular juror, only making a general objection to all of the jurors excused for cause on this basis. Underwood also asserts that a "death qualified" jury is incapable of rendering an impartial verdict.

¶27. On April 5, 1995, Underwood filed his Motion to Strike the Death Qualification Voir Dire Question and to Limit Disqualification for Particular Views on Punishment. Judge Toney ruled that pursuant to *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the State would be allowed to ask potential jurors if they had any "conscientious scruples" against the death penalty, but decided that those jurors would also be asked if they could set aside their views and follow the law. Jurors who stated that they would be able to set aside their personal opinions and follow the judge's instructions would be allowed to remain.

¶28. At the close of voir dire, on the State's motion and over Underwood's continuing objection, the trial court excused ten jurors for cause based upon their views opposing the death penalty. All ten of those jurors stated during individual voir dire that they would not be able to follow the law if that meant considering the death penalty during sentencing. Their stance did not stop at the level of a mere general objection to the death penalty. Underwood does not argue that these jurors would have been fair and impartial, but that their removal resulted in diminishing the number of black jurors left on the venire. The record reflects that two of these ten jurors were white; the race of the other eight is not identified. This may imply that all of the other eights jurors excused were black, but Underwood again fails to ensure that the record contains sufficient evidence to support his assignment of error. *Hansen*, 592 So.2d at 127. However, the race of the excused jurors is immaterial in light of the law governing this issue.

¶29. In *Witherspoon*, 391 U.S. at 522, the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Characterizing Illinois's sentencing scheme,

the Court stated, "In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die." *Id*. at 520-21. The Supreme Court clarified its *Witherspoon* decision in *Wainwright v. Witt*, 469 U.S. 412 (1985), adopted by this Court in *Fuselier v. State*, 468 So.2d 45, 53-55 (Miss. 1985). Reaffirming its decision in *Adams v. Texas*, 448 U.S. 38 (1980), the Court set out the standard for determining when it is proper to exclude a juror for cause based upon his views on the death penalty. "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424(*quoting Adams*, 448 U.S. at 45).

> The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.

*Id*. at 421. "[D]eference must be paid to the trial judge who sees and hears the juror." *Id*. at 426.

¶30. At first glance this issue may appear to be controlled by *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson*, the United States Supreme Court held that peremptory challenges could not be used to purposefully exclude members of the jury based solely upon their race. *Batson*, 476 U.S. at 89. However, *Batson* only applies to peremptory challenges, not challenges for cause. Because challenges for cause by nature must be made based upon a race-neutral reason, they are not subject to the *Batson* inquiry. Furthermore, we have previously held that opposition to the death penalty is a race-neutral reason for purposes of *Batson*. *Mack v. State*, 650 So.2d 1289, 1300 (Miss. 1994).

¶31. Although he does not cite *Batson* directly, Underwood's argument combines the reasoning in *Batson*, *Witherspoon*, and *Wainwright*. We have previously addressed a very similar issue in *Pinkney v. State*, 538 So.2d 329, 346-47 (Miss. 1988), *vacated on other grounds by Pinkney v. Mississippi*, 494 U.S. 1075 (1990). Pinkney argued that the prosecution used *Witherspoon* challenges for cause in violation of *Batson* to further the elimination of blacks from the jury. *Pinkney*, 538 So.2d at 346. This Court held:

> The challenges for cause are to be examined under the *Witherspoon* cases and peremptory challenges are to be examined under *Batson*. If each of the challenges are found to be constitutionally sound, then the combination is also sound. A successful *Witherspoon* challenge against a black juror is not relevant, because ". . . a defendant has no right to a petit jury composed in whole or in part of persons of his own race."

*Id*. at 346-47 (*quoting Batson*, 476 U.S. at 85 (*quoting Strauder v. West Virginia*, 100 U.S. 303, 305 (1879))).

¶32. Applying this reasoning to the current case, Underwood's argument fails. The State's challenges for cause were all proper under the standard set out in *Wainwright*. The race of those jurors, therefore, is not relevant. We give deference to the trial judge's decision to excuse the ten jurors for cause, and do not find merit in this assignment of error.

**III.**

**THE TRIAL COURT ERRED IN ADMITTING THE INVOLUNTARY CONFESSION OF JUSTIN UNDERWOOD INTO EVIDENCE IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

¶33. In his third assignment of error, Underwood complains about the admission into evidence of two statements which he made to police on March 9 and 10, 1994. Underwood argues that the statements were not made voluntarily and should have been suppressed at trial. He takes issue with the fact that Officer Barfield transcribed the statements instead of having Underwood write out his own confessions, and points to the errors in the dates of the statements and the use of terms allegedly above his education level as evidence of the unreliability of the statements.

¶34. Officers Barfield and Hathcock interviewed Underwood on March 9 regarding the February 5 burglary of Charlie Palmer's home. They read Underwood his rights as he read along at about 2:50 p.m., and Underwood signed a rights waiver at 2:55. They talked with Underwood for about thirty to forty-five minutes, but he denied any knowledge of the burglary. Barfield and Hathcock left Underwood alone and went to a break room for a cup of coffee. Officer Saxton came into the break room and asked to speak to Underwood, and they agreed. Saxton wanted to speak with Underwood, because he knew him from a previous burglary investigation, and they felt comfortable with one another. Although Saxton himself did not reread Underwood his rights, he did ask Underwood if the other officers had read them to him, and Underwood told Saxton that they had and that he understood his rights. Officer Saxton spoke with Underwood for about fifteen or twenty minutes, during which time he was able to convince Underwood to tell the other officers about the burglary. Barfield and Hathcock resumed their interview with Underwood, who proceeded to give a statement in which he admitted to breaking into Charlie Palmer's home on February 5 and taking a bowlful of pennies, a lady's ring, and the pistol that Charlie Palmer retrieved from Underwood's car on March 7. Barfield typed the statement based upon what Underwood told him, and then Underwood read and signed it at 4:30 p.m. At the suppression hearing, all three officers testified that no threats, promises, or intimidation were used to elicit Underwood's statement.

¶35. Before Underwood gave his March 10 statement to Officers Barfield and Saxton, in which he confessed to killing Mrs. Harris, the investigators again read Underwood his rights while he read along with a copy. Underwood signed another rights waiver form at 8:05 a.m. Barfield again typed the statement from the facts that Underwood gave him, and Underwood signed it at about 10:15 a.m. after reviewing the statement. Barfield testified both at trial and at the suppression hearing that he believed that Underwood's confession was voluntary, and that no coercion was used to elicit Underwood's statement. Officer Saxton agreed in his testimony at the suppression hearing that Underwood understood his rights, did not want an attorney, and gave his statement freely without force, intimidation, or promises.

> The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice. . . . [I]n determining whether a confession is freely and voluntarily given the circuit court judge sits as a trier of fact, and this Court should not reverse him unless the circuit judge is manifestly wrong.

*Herring v. State*, 691 So.2d 948, 956 (Miss. 1997) (internal citations omitted). This Court set out its

rule for proving the voluntariness of a confession in *Agee v. State*, 185 So.2d 671 (Miss. 1966).

> The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. . . . [W]hen, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness.

*Agee*, 185 So.2d at 673 (citations omitted). Although the importance of the *Agee* rule has been lessened by the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), "[t]he principle enunciated in *Agee* remains sound. . ." *Thorson v. State*, 653 So.2d 876, 888 (Miss. 1994). In this case, the State satisfied the *Agee* rule by presenting all of the officers present during Underwood's questioning at the suppression hearing. They testified that no threats or promises were made to induce Underwood to make his statements on March 9 and 10. The investigators also satisfied the warning requirements of *Miranda* by informing Underwood of his rights before questioning began each day.

¶36. Underwood claims that he invoked his right against self-incrimination during the March 9 interrogation by refusing to answer the investigators' questions for forty minutes. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. However, at the suppression hearing, Officers Barfield and Hathcock testified that Underwood never refused to speak to them, but initially denied any involvement in the burglary. They both testified that Underwood understood his rights, including his right to remain silent, voluntarily spoke with them, and never requested an attorney. Officer Saxton also confirmed the testimony of Barfield and Hathcock that no one promised anything to Underwood or threatened him in any way, and that Underwood stated that he understood his rights before voluntarily signing the rights waiver form.

¶37. In *Neal v. State*, 451 So.2d 743 (Miss. 1984), this Court approved the conduct of the interrogating officer who after a day and a half of intermittent questioning, ceased his interrogation until the next day upon Neal's request. *Neal*, 451 So.2d at 755. The next day, Neal gave his statement to the officer in which he confessed to the kidnapping and murder of the victim. *Id*. at 749, 751. This Court held that Neal's confession was made voluntarily and that he knowingly waived his right against self-incrimination due to the fact that the interrogating officer stopped questioning Neal whenever he asked, and because Neal was re-Mirandized each day before questioning began. *Id*. at 750-56. Here, Underwood never asked the interrogating officers to cease questioning. The March 9 interrogation, including the rights waiver and time to type the statement, only lasted a little over an hour and a half. The total time for the rights waiver, questioning, and statement typing in the March 10 statement was a little over two hours. Underwood was informed of his rights each day before questioning began. Based upon this evidence from the suppression hearing, Judge Toney properly

held that Underwood's statements were made voluntarily and were admissible.

¶38. On both the March 9 and March 10 statements, Officer Barfield accidentally wrote February instead of March as the date on which the statements were signed. However, the correct month did appear at the top of both statements. When Barfield later found his error, he corrected the dates. Although Officers Hathcock and Saxton testified that normal procedure would call for having a witness initial any changes to a statement, Officer Barfield did not have Underwood initial the date changes, because he felt that they were merely clerical and were not part of the substance of the statements. Barfield testified that for a substantive change, he would have a witness initial the statement change. Since the date corrections did not change the contents of Underwood's statements, we do not find that the trial judge erred in refusing to suppress them on that basis. Judge Toney allowed the statements to be admitted along with the testimony regarding the changes to the statement dates for the jury to determine whether the date changes affected their reliability. We defer to the jury's obvious finding that the date changes did not render the statements unreliable.

¶39. In the similar case of **Chisolm v. State**, 529 So.2d 630 (Miss. 1988), we confirmed the circuit court's finding that a confession was voluntary where the officers taking the defendant's statement testified that the defendant signed a rights waiver form after they explained his rights to him, the defendant never requested that the interrogation stop nor asked for an attorney, and the officers testified that no threats or promises were made. **Chisolm**, 529 So.2d at 633-34. In that case, too, the confession was transcribed by the officer taking the statement and then signed by the defendant. **Id**. at 633. Based upon the officers' testimony in this case, the trial judge did not err in finding that Underwood's statements were made voluntarily.

**IV.**

**THE TRIAL COURT ERRED, IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF APPELLANT, IN ALLOWING INTO EVIDENCE A STATEMENT ALLEGEDLY MADE BY APPELLANT JUSTIN UNDERWOOD THAT THE STATE UPON CHARGING HIM WITH BURGLARY WOULD SUBSEQUENTLY CHARGE HIM WITH THE MURDER OF THE VICTIM.**

¶40. Underwood argues that the trial court erred in admitting any evidence relating to the prior burglary of Charlie Palmer's house. On April 1, 1994, Underwood filed a motion in limine to exclude any evidence of prior burglaries. He also filed a motion to exclude evidence of any prior criminal activity. After hearing arguments from both sides, Judge Toney decided that the unrelated 1991 burglary conviction would not be admissible, but that discussing the alleged burglary in which the murder weapon was stolen would be "unavoidable." The trial court allowed Charlie Palmer and Deputy Roberts to testify regarding the alleged 1994 burglary of Palmer's home in which his .32 caliber pistol was stolen. The prosecution was able to show that the pistol, later recovered from Underwood's car, was the weapon used to murder Mrs. Harris. Underwood asserts that introduction of evidence regarding the alleged 1994 burglary was improper, prejudicial, and irrelevant. He argues that the State could have simply used Palmer's testimony that he found the gun in Underwood's car to link Underwood to the murder weapon.

¶41. "Relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court will reverse only where that discretion has been abused." **Hentz v. State**, 542 So.2d 914,

917 (Miss. 1989) (citations omitted).

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Miss. R. Evid. 404(b). If prior bad acts evidence falls within a 404(b) exception, its prejudicial effect must still be weighed against its probative value to determine admissibility under Miss. R. Evid. 403. *Mack*, 650 So.2d at 1311.

> Evidence of prior offenses committed by a defendant, not resulting in a conviction, is generally inadmissible either for impeachment purposes or as a part of the State's case in chief. On the other hand, our law recognizes certain exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences. Such proof of another crime is also admissible where it is necessary to identify the defendant, where it is material to prove motive, and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge.

*Neal*, 451 So.2d at 758-59 (citations omitted). "Evidence of other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury." *Ballenger v. State*, 667 So.2d 1242, 1257 (Miss. 1995) (*citing Brown v. State*, 483 So.2d 328 (Miss. 1986)). We have previously held that evidence of a prior burglary was admissible to show that the defendant had the opportunity to acquire the murder weapon. *Davis v. State*, 660 So.2d 1228, 1251-52 (Miss. 1995).

¶42. The evidence in this case regarding the 1994 burglary of Charlie Palmer's home was not used by the prosecution to prove Underwood's character or that he acted in conformity therewith. Underwood's attorney himself repeatedly argued that the only connection between Underwood and the murder weapon was Charlie Palmer's testimony. The trial judge properly found that avoiding this evidence would not be possible. It cannot be said that any prejudicial effect outweighed its probative value. Underwood's argument on this issue is unpersuasive.

¶43. Included in this assignment of error is Underwood's opposition to the admission of a statement that he made to Deputy Roberts in the patrol car after his arrest for the burglary. Over Underwood's objection, the deputy was allowed to testify that after he read Underwood his rights, and on the way to the jail in the patrol car, Underwood blurted out, "It's a wonder y'all didn't try to accuse me of killing Mrs. Harris." Deputy Roberts had not mentioned Mrs. Harris's murder to Underwood before he made this statement. Underwood asserts that this statement was clearly inadmissible hearsay. "Hearsay is not admissible except as provided by law." Miss. R. Evid. 802. Rule 801 of the Mississippi Rules of Evidence defines hearsay:

> (c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(d) Statements Which Are Not Hearsay. A statement is not hearsay if:

. . .

(2) Admission by Party-Opponent. The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity. . .

Miss. R. Evid. 801. Clearly Underwood's statement to Deputy Roberts was an admission and therefore not included in the definition of otherwise inadmissible hearsay. Even if the statement were hearsay, it could have been admitted under the present sense impression exception or the excited utterance exception under Miss. R. Evid. 803(1) and (2). Underwood's fourth assignment of error is meritless.

## V.

### THE PREJUDICIAL EFFECT OF THE INTRODUCTION OF THE VIDEO TAPE OF THE CRIME SCENE DEPICTING THE VICTIM'S BODY OUTWEIGHED THE TAPE'S PROBATIVE VALUE.

## VI.

### THE PREJUDICIAL EFFECT OF THE INTRODUCTION OF NUMEROUS GRUESOME PHOTOGRAPHS OUTWEIGHED THEIR PROBATIVE VALUE AND CONSTITUTES REVERSIBLE ERROR BY THE LOWER COURT.

¶44. Underwood's next two assignments of error are directed toward the trial court's allowing photographs and a video tape of Mrs. Harris's body at the crime scene and photographs of the body prior to the autopsy to be shown to the jury. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss. R. Evid. 403. Underwood argues that the photographs and video tape created unfair prejudice in the minds of the jury that outweighed any probative value.

> A general rule of this court leaves the admission of photographs into evidence to the sound discretion of the trial judge. Her decision is upheld unless there has been an abuse of that discretion. *Stringer v. State*, 548 So.2d 125, 134 (Miss. 1989). "[P]hotographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence.'" *McNeal v. State*, 551 So.2d 151, 159 (Miss. 1989) *quoting McFee v. State*, 511 So.2d 130, 135 (Miss. 1987).

*Mackbee v. State*, 575 So.2d 16, 31 (Miss. 1990).

> When deciding on the admissibility of gruesome photos, trial judges must consider: "(1) whether the proof is absolute or in doubt as to identity of the guilty party, [and] (2) whether the photos are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury."

*Holland v. State*, 587 So.2d 848, 864 (Miss.1991) (*quoting McNeal*, 551 So.2d at 159).

> [T]he lower court's judgment will not be reversed on the ground that photographs are gruesome and prejudicial, unless the lower court has abused its discretion.
>
> Moreover, in a slaying such as the instant case, in which the only eyewitness was the defendant, and it was argued that the slaying was something other than murder, the relevancy of photographs showing the scene and victim is increased.

*Griffin v. State*, 557 So.2d 542, 549-50 (Miss. 1990) (internal citations omitted). "The same standards applicable to determining the admissibility of photographs are applicable to video tapes." *Blue v. State*, 674 So.2d 1184, 1210 (Miss. 1996) (*citing Holland*, 587 So.2d at 864).

¶45. Over Underwood's objection, Judge Toney allowed the prosecution to enter five pictures of Mrs. Harris's body into evidence. State's Exhibit 5 is an 8x10 color photograph of Mrs. Harris's body as found by the lakeshore. It shows the body face down on the ground, wearing a blue shirt, black pants and belt, and red house shoes. There are patches of blood visible on the blue shirt. State's Exhibits 10, 11, and 12 are all 8x10 color photographs of the body just before the autopsy, showing the gunshot wounds. Little or no blood is evident in any of the autopsy photographs. Exhibit 10 shows Mrs. Harris's back with the two gunshot wounds, Exhibit 11 depicts the two arm wounds, and Exhibit 12 is a photograph of the gunshot wound to Mrs. Harris's neck and to the shoulder. State's Exhibit 17 is a 3x4 color photograph taken at the autopsy of Mrs. Harris's hand showing abrasions on her palm and fingers. These pictures are not particularly gruesome or inflammatory so as to shock or prejudice the jury in this case. The photographs were all relevant to show the victim's injuries and to help the jury visualize the crime and crime scene, corroborating the testimony of the investigators and partially corroborating Underwood's confession. Photographs showing Mrs. Harris's body wearing the red house shoes and the scratches on her hands from clutching weeds and grass were relevant to support the prosecution's theory of kidnapping, to refute any theory of assisted suicide, and to corroborate Dr. Hayne's testimony that Mrs. Harris did not die immediately. The trial court did not abuse its discretion in allowing these photographs to be admitted into evidence.

¶46. Also over Underwood's objection, Judge Toney allowed the prosecution to play a video tape for the jury of Mrs. Harris's body as it was found by investigators. After hearing the arguments from counsel, the judge determined that the jury would not be allowed to take the tape into deliberations, because he instructed the prosecutor to stop the tape before the body was turned over. The portion of the video tape shown to the jury depicts little more than State's Exhibit 5, the photograph of Mrs. Harris's body at the crime scene. The only additional footage is a shot of Mrs. Harris's ear, revealing that maggots had infested her ear. Judge Toney allowed the prosecution to show the tape through a closeup of the ear, because that evidence was used to help establish the time of death. Out of precaution, however, Judge Toney ruled that the remainder of the video tape, showing the investigators' further examination of the body after turning it over, would not be shown to the jury.

¶47. Underwood specifically points to this Court's decision in *McNeal*, *supra*, to support his argument that the video depicting maggots in Mrs. Harris's ear was inflammatory and lacked any evidentiary purpose. In *McNeal*, we held that the admission of closeup color photographs of the victim's decomposed, maggot-infested skull was an abuse of discretion. *McNeal*, 551 So.2d at 159. However, the Court described those photographs as "some of the most gruesome photographs ever presented to this Court." *Id*. Here, the short segment of video tape showing the inside of Mrs.

Harris's ear is not exceptionally gruesome, particularly since there is no visual evidence of decomposition. Furthermore, unlike the photographs in *McNeal*, the video of the maggots in Mrs. Harris's ear is relevant, because the evidence was used to establish the time of death. Judge Toney properly reviewed this evidence under Rule 403, and did not abuse his discretion in allowing the jury to view that portion of the prosecution's video tape.

## VII.

### THE JURY'S FINDING THAT THE VICTIM WAS KIDNAPPED BY APPELLANT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND WAS NOT ESTABLISHED BEYOND A REASONABLE DOUBT.

¶48. Underwood's next argument is that the prosecution failed to meet its burden of proof to sustain the jury's finding of kidnapping. He first refers to the lack of forensic evidence or eyewitness accounts to place him at the scene of the murder, in the Harris home, or in Mrs. Harris's car. Similarly, he points out that his car wasn't placed at the murder scene or Harris home. Underwood also argues that the position of the driver's seat in Mrs. Harris's car indicated that someone taller than he must have been driving it last. He emphasizes the failure of investigators to find his fingerprints on the murder weapon, the lack of evidence of theft, and the conflicting testimony regarding the number of gunshots fired.

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give prosecution [sic] the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found bey ond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*McFee*, 511 So.2d at 133-34 (*citing* **Gavin v. State**, 473 So.2d 952, 956 (Miss.1985); **May v. State**, 460 So.2d 778, 781 (Miss.1984)).

¶49. Underwood was convicted of capital murder during the course of kidnapping, under Miss. Code Ann.§ 97-3-19(2)(e). Mississippi's kidnapping statute makes it unlawful to "forcibly seize and confine any other person" or "inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will. . ." Miss. Code Ann. § 97-3-53 (1994). The prosecution is required to prove each element of the underlying kidnapping offense beyond a reasonable doubt in order for the capital murder conviction to stand. **Williams v. State**, 544 So.2d 782, 789 (Miss. 1987). Circumstantial evidence is sufficient to prove the elements of kidnapping. **Id**. "[D]irect evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." **Conner**, 632 So.2d at 1252 (*citing* **Fleming v. State**, 604 So.2d 280, 288-289 (Miss.1992); **Tolbert v. State**, 407 So.2d 815, 820 (Miss.1981)).

¶50. Substantial circumstantial evidence existed for the jury to find that the prosecution met its burden of proof regarding the kidnapping charge in this case. When Mr. Harris returned home on February 15, the lights and television were on, the shades were drawn, Mrs. Harris's makeup drawer was open, and her bottle of makeup was sitting upside down on the counter. Testimony showed that Mrs. Harris was a fastidious housekeeper and would never have left the house in such a state of disarray. Mr. Harris testified that his wife never left the house without makeup on and without being properly dressed. However, Mrs. Harris's body was discovered with foundation makeup on only half of her face, indicating that she was interrupted while applying her makeup. She was not dressed properly for leaving the house, still wearing her house shoes. Also, Mrs. Harris had taken only her morning medication and made her morning entries in her diet logbook, which listed that she had only had two glasses of water and no meals. Mrs. Harris had planned to go shopping in Jackson that day, but she missed two appointments there: one with Mona's Nails and one at Jenny Craig. Mr. Harris, Kyle, and Sergeant Tucker all testified that based upon the state of the house and Mrs. Harris's car when Mr. Harris arrived home, they believed that Mrs. Harris had been kidnapped.

¶51. Underwood's argument about certain missing evidence does not lessen the impact of the substantial evidence put on by the prosecution to show that Mrs. Harris was forced to leave her home against her will. No eyewitness testimony or forensic evidence was presented to place Underwood at the Harris home, in Mrs. Harris's car, or at the crime scene. However, direct evidence is not necessary to support the conviction in this case. **Williams**, *supra*; **Conner**, *supra*. Also, Sergeant Scarborough testified that it is certainly possible for a person to enter and exit a car (or house) without leaving any latent prints of value. Underwood argues that no evidence was presented placing his car at the crime scene or at the Harris home. However, Raymond Trainor did testify that he saw Underwood's car, or one very similar to it, parked near the Harris home on February 15 at approximately 10:00 or 10:30 a.m. The fact that Mrs. Harris's driver's seat was in its rearmost position reveals little, because the last person to drive her car could have pushed the seat back before exiting the car. Sergeant Tucker explained that no fingerprints were lifted from the murder weapon, because it had been handled by both Charlie Palmer and Deputy Roberts before it was turned over to her. If stolen items from the Harris home had been found in Underwood's possession, then the prosecution's case would certainly have been strengthened. However, theft is not an element of kidnapping, so the lack of evidence showing any stolen items from the Harris home lends nothing to Underwood's argument here. Similarly, the conflicting evidence concerning the number of gunshots bears no weight on the prosecution's proof of the underlying offense of kidnapping.

¶52. Considering all of the evidence in the light most consistent with the verdict, and giving the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence presented, reasonable and fair-minded jurors could at least have differed on the issue of kidnapping in this case. The prosecution presented sufficient circumstantial evidence to support its burden of proving beyond a reasonable doubt that Underwood forced Mrs. Harris to leave her home and go to Bozeman Lake against her will.

## VIII.

## THE COURT ERRED IN NOT GRANTING INSTRUCTION D-4.

¶53. Underwood asserts that the trial court should have granted his request for a jury instruction on

manslaughter based upon the defense theory of an assisted suicide presented in his confession.

¶54. Judge Toney rejected Underwood's Instruction D-4 on heat of passion manslaughter. After hearing argument from the attorneys, Judge Toney decided to deny Instruction D-4, finding that no evidence was presented at trial to show heat of passion. Underwood does not argue that he should have been granted an instruction on manslaughter as defined in Miss. Code Ann. § 97-3-27. Underwood's instruction on manslaughter takes its definition from Miss. Code Ann. § 97-3-35, which reads, "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35 (1994).

> Heat of passion has been defined by this Court as:
>
> In criminal law, a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait v. State*, 669 So.2d 85, 89 (Miss. 1996) (*quoting* **Buchanan v. State**, 567 So.2d 194, 197 (Miss.1990)). The trial judge correctly found that no evidence was presented at trial to show that Underwood acted out of provoked passion, anger, rage, hatred, furious resentment, or terror. Even if the jury believed Underwood's story that he killed Mrs. Harris in an assisted suicide, those facts would not allow a reasonable juror to conclude that Underwood acted in the heat of passion.

¶55. Judge Toney did grant Underwood's Instruction D-3 on the lesser included charge of simple murder.

> Lesser-included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense. . . .
>
> A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).

*Welch v. State*, 566 So.2d 680, 684 (Miss. 1990) (internal citations omitted) (*quoting* **McGowan v. State**, 541 So.2d 1027, 1028 (Miss. 1989)).

¶56. Taking Underwood's confession as true, the facts that he relayed to Investigator Barfield would support a conviction of murder. A criminal defendant is entitled to have his theory of the case presented to the jury in the instructions. *Sayles v. State*, 552 So.2d 1383, 1390 (Miss. 1989). Granting Instruction D-3 on simple murder allowed the jury to consider the option of finding that Underwood killed Mrs. Harris, but did not kidnap her. Although the judge could have amended Underwood's manslaughter instruction, granting Instruction D-3 satisfied the requirement of

instructing the jury on Underwood's sole defense theory. This assignment of error is also without merit.

¶57. Underwood has failed to raise any issues on appeal requiring reversal of his conviction by this Court. We therefore affirm the conviction of capital murder in this case.

## PART TWO: SENTENCING PHASE

### MILLS, JUSTICE, FOR THE COURT:

### IX.

### THE COURT ERRED IN REFUSING TO GRANT INSTRUCTION D-3.

¶58. During the sentencing phase of Underwood's trial, he submitted Instruction D-3, which read, "Regardless of the balance of aggravating and mitigating circumstances, you may afford Justin Underwood mercy in this proceeding." The trial court denied this instruction. The trial court also denied Underwood's Instruction D-10, which had exactly the same wording as Instruction D-3. Underwood argues that the jury should have been instructed on mercy, because it better explains the jury's discretion in sentencing. He cites *Wiley v. State*, 484 So.2d 339 (Miss. 1986), *vacated on other grounds by Wiley v. State*, 635 So.2d 802 (Miss. 1993), *overruled on other grounds by Willie v. State*, 585 So.2d 660 (Miss. 1991), in support of his argument. In *Wiley*, this Court stated in dicta, "Although this Court has held that no reversible error is committed in refusing a mercy instruction, the granting of such would further refine and direct the jury's discretion in sentencing between those cases in which the death penalty is given and those in which it is not." *Wiley*, 484 So.2d at 349. However, we went on to hold again that the trial court committed no error in refusing to instruct the jury on mercy. *Id*.

¶59. We have repeatedly held that capital defendants are not entitled to a mercy instruction. *Hansen*, 592 So.2d at 150; *Williams*, 544 So.2d at 788; *Lester v. State*, 692 So.2d 755, 798 (Miss. 1997); *Jackson v. State*, 684 So.2d 1213, 1239 (Miss. 1996); *Carr v. State*, 655 So.2d 824, 850 (Miss. 1995); *Foster v. State*, 639 So.2d 1263, 1299-1301 (Miss. 1994); *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss.1992); *Nixon v. State*, 533 So.2d 1078, 1100 (Miss. 1987). The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a trial jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial. *Saffle v. Parks*, 494 U.S. 484, 492-95 (1990). This assignment of error is plainly unpersuasive. The trial court did not commit reversible error in refusing to grant Underwood a mercy instruction.

### X.

### THE APPLICATION OF THE DEATH PENALTY IS DISCRIMINATORILY APPLIED TO AFRICAN-AMERICANS IN VIOLATION OF THE DUE PROCESS CLAUSE AND EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

¶60. On April 5, 1995, Underwood filed a motion to quash his indictment based upon the

discriminatory application of the death penalty in Mississippi. After hearing arguments from counsel at a May 5 hearing, Judge Toney denied his motion. In his final assignment of error, Underwood argues that the death penalty should be abolished, because it cannot be applied fairly or in compliance with equal protection. His primary argument is that the death penalty is disproportionately applied against black defendants in Mississippi. He points to statistics from the NAACP Legal Defense Fund from January 31, 1995, showing that thirty-two of Mississippi's fifty-three death row inmates at the time, 60%, were black, while only 36% of Mississippi's general population was black. At the motions hearing on May 5, Underwood submitted a list of Mississippi's death row inmates dated March 25, 1995, showing that thirty-six of the fifty-eight inmates (62%) were black. Out of these thirty-six, twenty-one (58%) had victimized whites. Forty-one of the fifty-eight death row inmates (71%) had white victims. Underwood also points to anti-death penalty studies and treatises to support his position that the application of the death penalty in Mississippi is determined by the race, sex, and economic class of the defendant and the victim, instead of by the severity of the crime.

¶61. Underwood cites Justice Douglas's concurring opinion in ***Furman v. Georgia***, 408 U.S. 238 (1972), to promote his argument. ***Furman*** is a brief per curiam opinion overturning the sentence of death in three cases because the Court found that imposition of the death penalty in those cases constituted cruel and unusual punishment. ***Furman***, 408 U.S. at 239-40. The five-member majority each wrote separate concurring opinions, and none of them joined another's opinion. The principle of ***Furman*** has become "that a sentencer's discretion to return a death sentence must be constrained by specific standards, so that the death penalty is not inflicted in a random and capricious fashion." ***Walton v. Arizona***, 497 U.S. 639, 657 (1990) (Scalia, J., concurring). This rationale has developed through subsequent cases following the opinions of Justices Stewart and White. ***See Id***. at 657-60 (Scalia, J., concurring).

¶62. Justice Douglas based his concurring opinion in ***Furman*** upon the ground that "it is 'cruel and unusual' to apply the death penalty--or any other penalty--selectively to minorities whose numbers are few, who are outcasts of society, and who are unpopular, but whom society is willing to see suffer though it would not countenance general application of the same penalty across the board." ***Furman***, 408 U.S. at 245. However, Justice Douglas recognized that the source of the problem was that the "uncontrolled discretion" of sentencers enabled the death penalty to be applied in a discriminatory manner. ***Id***. at 253-55. This Court has repeatedly held that Mississippi's statutory sentencing scheme in capital cases complies with the requirements of ***Furman*** and its progeny. ***Lester***, 692 So.2d at 788; ***Blue***, 674 So.2d at 1205-1207; ***Brown v. State***, 682 So.2d 340, 354 (Miss. 1996); ***Foster v. State***, 687 So.2d 1124, 1139 (Miss. 1996); ***Leatherwood v. State***, 435 So.2d 645, 650 (Miss. 1983). Furthermore, the United States Supreme Court has approved Georgia's sentencing scheme, similar to Mississippi's, in which the use of aggravating and mitigating circumstances and a meaningful appellate review satisfy the requirements of ***Furman***. ***Gregg v. Georgia***, 428 U.S. 153, 196-98 (1976). In Mississippi the death penalty is not applied in a discriminatory manner as a result of any arbitrary sentencing scheme.

¶63. The United States Supreme Court rejected this identical argument in ***McCleskey v. Kemp***, 481 U.S. 279 (1987). McCleskey argued that Georgia's capital punishment statute violated equal protection, based upon a study showing that black defendants were more likely to be sentenced to death than white defendants, and defendants murdering whites were more likely to be sentenced to death than defendants who murdered blacks. ***McCleskey***, 481 U.S. at 291-92. The Court held that in

order to raise a successful claim of an equal protection violation, the criminal defendant must prove that "the decisionmakers in his case acted with discriminatory purpose." *Id*. at 292. McCleskey's only proof supporting his claim were the results of the study. The Court determined that due to the number of variables inherent in capital sentencing and the discretion allowed trial courts in implementing criminal justice, the use of statistical evidence was insufficient to prove purposeful discrimination. *Id*. at 292-97.

¶64. Underwood has failed to offer any substantial proof that the death penalty is applied in a discriminatory manner in Mississippi today, or that he suffered discriminatory application of the law. Underwood's argument is based solely on insufficient statistical evidence and the bald assertion that had he been convicted of murdering an African-American instead of a white woman, he would have been sentenced to life imprisonment. We refuse to reverse Underwood's sentence of death based upon this assignment of error.

## XI.

## REVIEW OF SENTENCE UNDER MISS. CODE ANN. § 99-19-105

¶65. Although not raised as an issue on appeal by Underwood, Section 99-19-105(3) of the Mississippi Code requires this Court to review the sentencing process in all cases in which the death penalty is imposed to determine:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and

> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Miss. Code Ann. § 99-19-105(3) (1994) (amended 1994 eff. August 23, 1994). In this case, the jury found three statutory aggravating circumstances: 1) that the murder was committed by a person under sentence of imprisonment, 2) that the murder was committed during the commission of kidnapping, and 3) that the murder was especially heinous, atrocious, or cruel. As previously discussed, there was sufficient evidence for the jury in this case to find that Underwood kidnapped Mrs. Harris. The prosecution also met its burden of proof for showing that at the time of the murder, Underwood was serving a suspended sentence for burglary of a dwelling. We also hold that the jury properly found the murder to be especially heinous, atrocious, or cruel.

¶66. Judge Toney instructed the jury that "an especially heinous, atrocious, or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders, the conscienceless or pitiless crime which is unnecessarily torturous to the victim." The United States Supreme Court and this Court have repeatedly approved this language as a proper limiting instruction on the HAC aggravator. *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss. 1992) (*citing Coleman v. State*, 378 So.2d 640, 648 (Miss.1979); *Evans v. State*, 422 So.2d 737, 743 (Miss.1982) *cert. denied*, 461 U.S. 939 (1983); *Pinkney v. State*, 538 So.2d 329, 357 (Miss.1988), *vacated on other*

*grounds*, 494 U.S. 1075 (1990); *Clemons v. Mississippi*, 494 U.S. 738 (1990)).

¶67. In his dissent, Presiding Justice Sullivan asserts that because there was no testimony proving how long Mrs. Harris remained conscious after she was shot, "the jury could not know whether Mrs. Harris suffered to the extent required for a finding that her murder was so 'conscienceless or pitiless' as to set it apart from other murders." Following this logic, the measure of Underwood's lack of conscience and pity is the extent of pain and suffering that Mrs. Harris actually felt.

¶68. Justice demands that the focus remain strictly on the defendant. Underwood's culpability can only be measured by his own mental state and actions. Mrs. Harris' ability to remain conscious while sustaining gunshot wounds is irrelevant. Nonetheless, the evidence indicates that Mrs. Harris suffered greatly.

¶69. Underwood kidnapped Mrs. Harris from her own home. He made her walk to her impending doom on nerve damaged feet, all the while leaving her to ponder how, when, why and in what manner she would be executed. When the two arrived at Underwood's chosen execution site, he ordered Mrs. Harris to kneel before him. He then stood a couple of feet away, and savagely fired four shots into her fragile body. The first bullet tore through her right lung, diaphram and liver. The second ripped though her bloody back only to further tear apart her damaged right lung. The next bullet took a brutal path through her left ear, neck and shoulder. The final bullet ripped through Mrs. Harris' left arm.

¶70. We stated in *Davis v. State*, 684 So.2d 643 (Miss.1996), that,

> The number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged, provided support for the jury's findings that this murder was unnecessarily tortuous to Hillman.

*Davis*, 684 So.2d at 662.

¶71. *Davis* makes no mention of the victim's consciousness after sustaining the wounds that ultimately caused her demise. The length of time that it took the victim to die was relevant only to prove that she was still trying to defend herself from the defendant's stabbing attack after he had twice shot her. Furthermore, the length of time it took the victim to die was not the dispositive fact of *Davis*. It was only one factor considered. Our case law is replete with cases where the length of time that it took the victim to die was not considered to be dispositive on appeal. This case must not be treated any differently.

¶72. Based upon our review of the sentencing phase of this trial, we find no evidence that the jury was swayed by passion or prejudice in reaching its decision. We also conclude that the death penalty is neither excessive nor disproportionate in this case as compared to similar cases.

¶73. **PART ONE: CONVICTION OF CAPITAL MURDER AFFIRMED.**

**SULLIVAN, P.J., PRATHER, C.J., PITTMAN, P.J., BANKS, ROBERTS, SMITH AND MILLS , JJ., CONCUR. McRAE AND WALLER, JJ., NOT PARTICIPATING.**

¶74. **PART TWO: SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED.**

**EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(1972) AND M.R.A.P. 41(a).**

**MILLS, J., PRATHER, C.J., PITTMAN, P.J., ROBERTS AND SMITH, JJ., CONCUR. SULLIVAN, P.J., DISSENTS AS TO PART TWO WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, J. McRAE AND WALLER, JJ., NOT PARTICIPATING.**

### SULLIVAN, PRESIDING JUSTICE, DISSENTING AS TO PART TWO:

¶75. I disagree with the majority's review of the statutory aggravating factors and affirmance of the sentence in this case. Therefore I must respectfully dissent.

¶76. I find no error in the jury's findings that Underwood kidnapped Mrs. Harris, and that at the time of the murder, Underwood was serving a suspended sentence for burglary of a dwelling. However, I believe that the trial court erred in submitting an instruction to the jury on the especially heinous, atrocious, or cruel aggravator (HAC aggravator).

¶77. The instruction given by Judge Toney on the HAC aggravator was sufficiently limited to meet the constitutional guidelines. In this case, however, the instruction was not warranted. The prosecution failed to present sufficient evidence to prove that the murder of Virginia Ann Harris met the legal definition of especially heinous, atrocious, or cruel.

> [I]n *Hansen v. State*, 592 So.2d 114 (Miss.1991), we noted that when considering whether a crime could be considered "especially heinous, atrocious or cruel,"
>
> barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or tortuous death was suffered by the victim.
>
> *Id*. at 152 (*quoting* **Pinkney v. State**, 538 So.2d 329, 357 (Miss.1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990)).

*Brown v. State*, 690 So.2d 276, 295 (Miss. 1996). In this case, the prosecution presented no evidence of serious mutilation or dismemberment of the corpse. What remains is a consideration of whether sufficient evidence was presented to find that the death was lingering or torturous, or whether the defendant inflicted physical or mental pain before death.

¶78. During the guilt phase of Underwood's trial, the pathologist testified that it would have taken a minimum of fifteen to twenty minutes for Mrs. Harris to die from her wounds. Testimony also revealed that Mrs. Harris's hands had blood stains on them and were scratched from grasping weeds. The prosecution argued that this evidence showed that Mrs. Harris died painfully while "grabbing at the holes on her body" and "holding onto the good earth." However, no evidence was offered to prove how long Mrs. Harris would have remained conscious after being shot. The lack of any such evidence distinguishes this case from *Davis v. State*, 684 So.2d 643 (Miss. 1996), relied upon by the majority, in which this Court accepted the length of death as evidence of the HAC aggravator. *Davis*,

684 So.2d at 649, 662-63. In *Davis*, evidence was presented to show that the victim could have moved about for fifteen to twenty minutes after sustaining gunshot wounds. Contrary to the majority's interpretation, this was evidence that the victim was conscious, and is a distinguishing factor from this case. Testimony regarding the length of conscious suffering supported the jury's finding of the HAC aggravator in *Davis*. Without any such testimony here, we cannot know, and more importantly, the jury could not know whether Mrs. Harris suffered to the extent required for a finding that her murder was so "conscienceless or pitiless" as to set it apart from other murders.

¶79. At sentencing, the prosecution also argued that Mrs. Harris suffered mental torture and physical pain, because she was forced from her home and made to walk some distance before being murdered. The State argued that this would have been both mentally straining and extremely painful for Mrs. Harris because of a nerve ending disorder that caused her feet to hurt when she walked. However, the testimony during the sentencing phase showed that Mrs. Harris was on medication to deaden the nerve endings in her feet. Compared to the physical and mental torture evidenced in previous murder cases before this Court, I simply cannot agree that the murder of Mrs. Harris was especially heinous, atrocious, or cruel within the legal meaning of that phrase.

¶80. Because I find that the HAC aggravator was not supported by the evidence in this case, I would reverse the sentence of death by lethal injection and remand this case for resentencing.

**BANKS, J., JOINS THIS OPINION.**


## APPENDIX


## DEATH CASES AFFIRMED BY THIS COURT


*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)


***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.


*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)**, *Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).


### DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

*Snelson v. State,* --- So. 2d --- (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

**DEATH CASES REVERSED AS TO GUILT PHASE**

**AND SENTENCE PHASE**

(**continued**)

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED**

**AS TO PUNISHMENT AND REMANDED**

**FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*****Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State,*** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

## <u>(continued)</u>

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).


\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.