IN THE SUPREME COURT OF MISSISSIPPI
NO. 98-KA-00008-SCT

*BOMAN L. TANNER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/15/1997 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL J. MALOUF, SR. |
| | MICHAEL JAMES MALOUF, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART AND |
| | REMANDED - 05/04/2000 |
| MOTION FOR REHEARING FILED: | 6/1/2000; denied 8/24/2000 |
| MANDATE ISSUED: | 8/31/2000 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Boman L. Tanner ("Tanner") was indicted for the crime of capital murder in the Circuit Court of Hinds County, First Judicial District. On October 15, 1997, Tanner was convicted by a jury for the capital murder of Verna Wood and sentenced to a term of life imprisonment in the custody of the Mississippi Department of Corrections. Tanner appeals to this Court, raising 13 issues as grounds for reversal. Because ***Batson*** errors were committed at the trial level, we remand for a ***Batson*** hearing consistent with this opinion. All other issues are affirmed upon appeal.

## STATEMENT OF THE CASE AND FACTS

¶2. Verna Wood ("Wood") was an elderly woman who lived in Jackson, Mississippi, across the street from Tanner. On March 6, 1997, the Jackson Police were notified that Wood had been found dead in her home. Originally, the death was thought to be from natural causes. The body was removed and examined by Robert Martin, Hinds County coroner, who determined that Wood's death was not natural and ordered an autopsy. The autopsy, performed by Dr. Rodrigo Galvez, revealed that Wood died from a bullet wound to the back of the head. The autopsy further revealed it was not suicide and that Wood had died sometime between 2:00 p.m. and 8:00 p.m. the previous day. Although there were no signs of forced entry, it was

determined that several of Wood's diamond rings were missing.

¶3. According to Julie Tanner, Tanner's wife, Tanner had befriended Wood and often helped her with small chores around her house. On the day Wood's body was found, Tanner tapped Detective Reggie McCann on the shoulder and informed him that his fingerprints would be all over Wood's house. He further informed Detective McCann that he had recently helped Wood break into a little safe at her request.

¶4. On March 5, 1997, the day of Wood's death, Tanner left the Isle of Capri Casino in Vicksburg at 2:48 p.m. According to Detective Grant Parker, it takes approximately 42 minutes to travel from the Isle of Capri Casino to Tanner's home. Telephone records indicate on March 5, 1997, at 3:35 p.m., Tanner made a phone call from his house to the MEA Clinic at the reservoir, where his wife worked, to inform his wife he would be late picking her up.

¶5. Tanner was next seen at Crown Jewelers in the Park Place Shopping Center in Pearl. According to Detective Parker, it takes approximately 16 minutes to travel from Tanner's residence to Crown Jewelers. Jim Eutzler, owner of Crown Jewelers, testified that Tanner stayed at the store for approximately 40-45 minutes and left at approximately 4:40 p.m. Tanner had been there trying to sell diamonds which matched those taken from Wood.

¶6. Telephone records next indicate that Tanner telephoned his mother, Barbara Stewart, at 5:05 p.m. from a service station located just down the street from Crown Jewelers. Tanner called his mother and asked her to pick up his wife and son for him. She did so and brought the two back to her house. At approximately 6:15 p.m., Tanner went by his mother's house, picked up his wife and son, and took them home.[1]

¶7. That same day, Wood had a dental appointment at 1:45 p.m. with Dr. Westover. Martha Boyd, an employee at Dr. Westover's office, testified that Wood was on time for her appointment and left the office sometime between 3:15 and 3:30 p.m. Boyd further testified that Wood was wearing her diamond rings when she was at the dentist's office. Additionally, Ethel Taylor, Wood's housekeeper, was at Wood's home when she left for her dental appointment. Taylor also saw the rings that day and testified she helped Wood retrieve one of the rings from the recliner earlier that morning. When Taylor left Wood's house between 3:00 and 3:30 p.m., Wood was not back from her dental appointment.

¶8. On March 10, 1997, the Jackson Police Department received information, through a pawn sheet, that the missing diamonds had been sold to DJ's Silver Mine Pawn Shop on March 6, 1997. Further investigation revealed that Tanner had sold the diamonds to DJ's in exchange for $3,700. Thereafter, detectives arrived at Tanner's home and took him to the police station for questioning. During questioning, Tanner admitted he stole the diamonds from Wood "two or three weeks ago", but denied that he killed her. He was then placed under arrest and charged with capital murder.

¶9. Further investigation led to the testimony of Wood's neighbor, Rosemary Scheuerman ("Scheuerman"), who saw Wood on March 5, 1997, between 4:20 and 4:35 p.m.. According to Scheuerman, as Wood pulled into her driveway, another vehicle pulled up and parked beside her. Scheuerman further testified that she saw someone follow Wood inside her home. She also testified that she would "not have assessed [the person] as being the same build as Bo Tanner."

¶10. At trial, the State presented the testimony of Austin Shaddix ("Shaddix"), an inmate who had been jailed with Tanner. According to Shaddix's testimony, Tanner told him that he killed Wood and described

the circumstances surrounding the murder. Tanner told Shaddix that he had lost approximately $3,000 at a casino that day and was worried that "he was going to lose everything he had over his gambling." According to Shaddix, Tanner saw Wood pull into her driveway and followed her into her house. Tanner entered the front door and walked into the bedroom intending only to strike Wood to render her unconscious. When he approached her from behind, however, he thought she sensed his presence. Tanner then panicked, shot Wood in the back of the head, removed the rings from her fingers, and left the house. Tanner was unsuccessful at pawning the rings that night, but sold the rings the next day to DJ's Silvermine for $3,700.

¶11. On October 15, 1997, a jury found Tanner guilty of capital murder. He is currently serving a term of life in the custody of the Mississippi Department of Corrections. Tanner maintains that he did not kill Wood and that the evidence provided at trial provides an incontrovertible alibi.

## STATEMENT OF LAW

### I.

### WHETHER THE LOWER COURT ERRED IN NOT FINDING A BATSON VIOLATION

¶12. In *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court held that a defendant may establish a prima facie case of purposeful discrimination during jury selection based solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish the prima facie case under *Batson*, the defendant must ordinarily establish:

> (1) That he is a member of a cognizable racial group;

> (2) That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and

> (3) That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Lockett v. State*, 517 So.2d 1346, 1349 (Miss.1987). Furthermore, the United States Supreme Court broadened the scope of *Batson* by allowing a white defendant to also have standing to challenge the prosecution's use of its peremptory strikes to remove black venire members. *Powers v. Ohio*, 499 U.S. 400, 408, 111 S.Ct. 1364, 1369, 113 L. Ed. 2d 411 (1991). Consequently, the defendant does not have to show that he is a member of a cognizable racial group to establish a prima facie case of discrimination. *Davis v. State*, 660 So. 2d 1228, 1240 (Miss. 1995). A white defendant must only show that the prosecutor has used peremptory challenges on a person of race and that the circumstances give rise to the inference that the prosecutor used the peremptory challenges in order to strike minorities. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991).

¶13. Once the defendant sets forth a prima facie case, "the burden shifts to the State to come forward with a race-neutral explanation for challenging the jurors." *Mack v. State*, 650 So. 2d 1289, 1296 (Miss. 1994). The trial court must then determine whether the objecting party has met its burden of proving there has been purposeful discrimination in the exercise of the peremptory challenge. *Walters v. State*, 720 So. 2d 856, 865 (Miss. 1998).

¶14. Finally, great deference is given the trial court when determining whether the offered explanation under the unique circumstances of a case is truly a race-neutral reason. *Id.* Accordingly, "we will not reverse a trial judge's factual findings on this issue unless they appear clearly erroneous or against the overwhelming weight of the evidence." *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995).

¶15. Tanner is a white male. Tanner asserts the trial court erred by not finding a *Batson* violation during voir dire. Tanner specifically alleges the State "set a clear pattern of striking minorities from the jury" since 11 of its 12 peremptory challenges excluded black veniremen. After the defense asserted this challenge, the court called upon the State to provide racially neutral reasons for the strikes. This Court now addresses these African-American strikes.

## A.

**Dorothy Clark...there are two bases for her being stricken. One of them is the fact that her son at this moment is charged as a defendant in a drug prosecution; and secondly based on the answers that she gave with respect to the death penalty questions.**

¶16. Clark stated during voir dire that she is not opposed to the death penalty and that the State is sometimes justified in taking another person's life. Consequently, Clark is neither for nor against the death penalty, and as such, can not be disqualified on that basis. However, Clark's son was charged, at the time, as being a defendant in a drug prosecution. "Striking a juror because of the conviction or charge of a family member is a valid, race-neutral reason to exercise a peremptory strike." *Magee v. State*, 720 So. 2d 186, 189 (Miss. 1998). Therefore, Tanner's argument that Clark was excluded based on race is without merit.

## B.

**Kelly Stewart...she says she was the victim of an attempted rape and that she was a victim of some other crime, and that the cases are pending now. ...she stated general opposition to the death penalty unless the killing was planned, intentional, or so heinous that the accused poses a threat to the entire human race.**

¶17. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S. Ct. 1859, 1866, 114 L. Ed. 2d 395 (1991)(plurality opinion)). It can hardly be said that striking a juror who has been the victim of a crime or attempted crime is racially motivated. Consequently, Tanner's argument that Stewart was excluded based on race is without merit.

## C.

**Shirley Walton Williams...Her brother was recently involved in a case that I'm afraid the Court is familiar with, the case of United States of America versus Willie Culley, et al. She said that she has some legal knowledge and she worked as a paralegal for a criminal defense attorney.**

¶18. As previously indicated, "striking a juror because of the conviction or charge of a family member is a valid, race-neutral reason to exercise a peremptory strike." *Magee*, 720 So. 2d at 189. Therefore, Tanner's argument that Williams was excluded based on race is without merit.

**D.**

> **Reginald Givhan...this defendant had a brother who was convicted of the crime of armed robbery, Lafayette County. Additionally, co-counsel advises me that he has debated the merits of the death penalty on numerous occasions on the campus at Tougaloo where this juror is employed as the director of the student program. My counsel advises me that invariably the opponents to the death penalty are somehow connected to that same institution too.**

¶19. The exercise of a peremptory challenge against a prospective black juror is race neutral when the juror is related to someone who has been tried for a felony. *Griffin v. State*, 607 So. 2d 1197, 1203 (Miss. 1992). Accordingly, Tanner's argument that Givhan was excluded based on race is without merit.

**E.**

> **Dana Grant...his brother was convicted of a drug offense in Texas. And he gave as an example of a situation for which he would consider the death penalty as being when an individual was in his words beyond rehabilitation.**

¶20. "Striking a juror because of the conviction or charge of a family member is a valid, race-neutral reason to exercise a peremptory strike." *Magee*, 720 So. 2d at 189. Therefore, Tanner's argument that Grant was excluded based on race is without merit.

**F.**

> **Jimmie Judge...the venire person initially stated when he was being questioned that in a prosecution based on circumstantial evidence that he would require that evidence to rise to such a level as to remove all doubt from his mind, which of course is not the law.**

¶21. According to the State, Judge was dismissed because he said he would require a circumstantial evidence instruction to "remove all doubt whatsoever from his mind", which is not the law in Mississippi. Although Judge later answered that he could follow a reasonable doubt instruction, the record reflects at least five other places where Judge says he would need to "remove all doubt whatsoever." In *Manning v. State*, 735 So. 2d 323, 337 (Miss. 1999), this Court upheld the trial court's exclusion of three jurors for "their inability to follow the law and the court's instructions." Judge's answers were, at best, contradictory and indicative of his unwillingness following the law. Therefore, Tanner's argument that Judge was excluded based on race is without merit.

**G.**

> **Juanita Brown...the first question asked by this venire person was how much does this jury service pay...secondly, she initially said that she would not consider as a realistic option the death penalty to a case based entirely on circumstantial evidence.**

¶22. This Court is unable to conclude how such a question posed by a potential juror came across. It is very likely, and highly probable, that the juror put forth a demeanor of indifference to the adversarial process by first inquiring about money. We have consistently held that an individual's demeanor is an appropriate race neutral reason for a peremptory challenge. *Walters*, 720 So. 2d at 866. Furthermore, this

Court has held that general indifference to the voir dire process is a legitimate race neutral reason for a peremptory challenge. *Bounds v. State*, 688 So. 2d 1362, 1368 (Miss. 1997). What is meant by a "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. *Purkett*, 514 U.S. at 769. Consequently, this Court finds Tanner's argument that Brown was excluded solely on the basis of race to be without merit.

### H.

**Lula Hurst...her brother has a DUI and received some punishment for it. I was concerned about her nephew too is on the Hinds County farm. I was also concerned about how serious she takes jury service. Since in a response to a question about her attitude toward gambling she said quote, I'm trying to get to the boat myself right now.**

¶23. Tanner incorrectly contends the State failed to give a reason for Hurst's dismissal. Although the State failed to state her name at the beginning of its reasons noted above, the record clearly indicates that Hurst was the juror being struck.

¶24. As stated previously, "striking a juror because of the conviction or charge of a family member is a valid, race-neutral reason to exercise a peremptory strike." *Magee*, 720 So. 2d at 189. Furthermore, inattentiveness is a valid racially neutral reason for striking a juror. *Bounds*, 688 So. 2d at 1367-68. Consequently, valid, race-neutral reasons were provided for Hurst's dismissal, and Tanner's argument is without merit.

### I.

**Janifer Stevens...her brother was convicted, I believe it was last year, on federal drug charges. He is now in the Madison County jail serving time on that. And in addition, in response to one of the death penalty questions she said that she didn't really think that the death penalty served any purpose inasmuch as it would not bring back the victim. And she said she may be able to consider it only if it was some member of her family.**

¶25. "Striking a juror because of the conviction or charge of a family member is a valid, race-neutral reason to exercise a peremptory strike." *Magee*, 720 So. 2d at 189. Furthermore, Tanner points out in his brief that Stevens's mother works for Tommy Mayfield, one of the prosecutors in this case. Therefore, Tanner's argument that Stevens was excluded based on race is without merit.

### J.

**Bryan Austin...only white male ...we're not required to give an answer on him**.

¶26. Tanner, in his brief, states that there is no dispute Austin was most likely dismissed because his father was a well known criminal defense attorney.

¶27. Additionally, Tanner asserts that two additional African-American jurors, Kasenda Lampkin and Kimberly Cain, were struck without explanations for their dismissals. The prosecution used eleven of its twelve peremptory challenges to strike African American jurors. Although the trial judge was not sure that Tanner made a prima facie showing of purposeful discrimination, that is of no significance here, since federal decisions make it clear that once a prosecutor comes forward with reasons for his peremptory strikes the

defendant's prima facie showing is no longer at issue. *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395, 405 (1991). Once the defendant makes a prima facie showing, the prosecution must rebut this showing by giving race neutral reasons for excluding the jurors. *Henley v. State*, 729 So.2d 232, 239 (Miss. 1998). The defendant is then given an opportunity to rebut those reasons. *Gayle v. State*, 743 So.2d 392, 401 (Miss. Ct. App. 1999)(citing *Taylor v. State*, 524 So.2d 565, 566 (Miss. 1988)). Apparently, the prosecutors simply overlooked Lampkin and Cain, the other two jurors stricken. No one mentioned them at all and, therefore, no reasons were ever given by the prosecution to rebut Tanner's challenge. Thus, the trial court erred and the defendant's prima facie case stands as to Lampkin and Cain. Accordingly, we remand to the trial court for a *Batson* hearing as to these two jurors.

## II.

### WHETHER THE TRIAL COURT ERRED IN EXCUSING JURORS FOR CAUSE BASED UPON THEIR VIEW OF THE DEATH PENALTY

#### A. Standard of Review

¶28. Prospective jurors in capital cases may only be excluded for cause based upon their views on capital punishment when those views would "prevent or substantially impair the performance of [their] duties as jurors in accordance with [their] instructions and oath." *Simon v. State*, 688 So. 2d 791, 799 (Miss. 1997); *see also* *Witherspoon v. Illinois*, 391 U.S. 510**,** 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). "Stated another way, a prospective juror merely stating general objections or expressing conscientious or religious scruples against inflicting the death penalty is not enough for that juror to be excused for cause." *Simon*, 688 So. 2d at 800. "The juror need not expressly state that he absolutely refuses to consider the death penalty; an equivalent response made in any reasonable manner indicating the juror's firm position will suffice."*Id.* at 799.

¶29. Furthermore, since a juror's bias against the death penalty does not have to be proven with unmistaken clarity, the decision of whether or not to excuse the juror is left to the trial court's discretion. *Id.* "Deference must be paid to the trial judge who sees and hears the juror." *Underwood v. State*, 708 So. 2d 18, 28 (Miss. 1998). Accordingly, "the determination of whether a juror is fair and impartial is a judicial question, and will not be set aside unless such determination is clearly wrong." *Simon*, 688 So. 2d at 799.

#### B. Analysis

¶30. Tanner argues that the trial court erred by dismissing ten members of the venire for cause based upon their views on the death penalty. Tanner specifically asserts that four of the ten veniremen were willing to follow the law as given and should not have been excluded for cause.

#### 1. Charles Hammond

Q: Would that be the way that you would stand if you were chosen as a juror in this case, that you would not believe in taking someone's life?

A: Right.

Q: And I understand you don't generally favor it, but under certain circumstances you could rule that way if that is what the Court rules, or instructs?

A: Like I said, I would find it difficult though, yes.

## 2. Elaine Harrell

Q: Would you base your decision upon that evidence and the law the Court gives you with regard to how you may sentence him?

A: Yes. I would try to, but still that - my first feelings would still be there, that I would not want to give a death penalty without an eyewitness.

## 3. Jessie Hooker

Q: Is that the only way you could consider the death penalty is if you were there yourself and saw it happen?

A: I don't see where I could condemn a man to death.

Q: Other than you being there, you never could convict?

A: I could never condemn a man to death. No.

Q: ...in your mind if you are convinced that he is guilty, then you can consider the death penalty at that time; is that right?

A: I would consider it, yes.

## 4. Vellana Davis

Q: Could you ever really consider giving the death penalty to someone if he didn't murder a child?

A: No, I couldn't.

Q: So if you want to give somebody a really harsh punishment, is it your thinking it would be better to send them to Parchman for life rather than just let them go to sleep?

A: Yes.

¶31. "This Court recognizes that it is often difficult for a juror to express in precise terms his or her feelings about, understanding of, and willingness to impose the death penalty." *Simon*, 688 So. 2d at 800. "The difficulty of verbally expressing such views, of course, makes the interpretation of the juror's voir dire extremely difficult." *Id*. Accordingly, "we look to not only the ruling but the setting and time devoted to the questions, and the opportunity of sequestered voir dire." *Id*. In the present case, the testimony of all four jurors, although somewhat contradictory at points, seemed to indicate opposition to the death penalty. It was therefore not unreasonable for the trial court to conclude these jurors might be unable to apply the law or view the facts impartially. As stated previously, "deference must be paid to the trial judge who sees and hears the juror." *Underwood*, 708 So. 2d at 28. Accordingly, this Court finds the record supports the trial court's removal of these veniremen.

## III.

## WHETHER THE LOWER COURT ERRED IN NOT DISMISSING JURORS FOR CAUSE WHO WOULD AUTOMATICALLY VOTE FOR THE DEATH PENALTY

¶32. Tanner argues that the trial judge erred by denying his challenges for cause against four jurors who would only consider the death penalty and no other option. In *__Witherspoon v. Illinois__*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court set forth the criteria upon which a challenge for cause of this nature may be sustained. "A sentence of death cannot be executed if the jury was simply chosen by excluding potential jurors for cause simply because they voiced general objections or conscientious scruples against the death penalty." *Williams v. State*, 445 So. 2d 798, 805 (Miss. 1984). Instead, the State is permitted to exclude potential jurors only if (1) they would automatically vote against capital punishment without regard to the law and the evidence, or (2) their attitude toward the death penalty would prevent them from making an impartial decision as the defendant's guilt. *Id.* Tanner challenged four jurors based upon their views of the death penalty and was denied. Those jurors' testimony, in relevant part, was as follows:

### 1. Patrick Eugene Pandolfi

Q: Does that mean if you find him guilty of capital murder then you would automatically vote for the death penalty?

A: I would be strongly in favor of it.

Q: You can set aside your personal opinion and weigh what the law is and what the evidence is before making a decision?

A: Certainly.

Q: And would you do that?

A: Uh-huh.

### 2. Albert Arnold

Q: So just because you found somebody guilty of murdering someone else, premeditated murder of someone else during a robbery, wouldn't mean that you would automatically vote for the death penalty?

A: No, it would just depend on the evidence and the circumstances.

Q: And I think you will probably know some of the police officers that testify, Winstead, or some of the others. Would you have any tendency to give more credibility to their testimony than other people?

A: No, sir. The only way I know those individuals are through my past employment with the police department. As far as knowing them personally, I don't.

### 3. William Richardson

Q: Of course, I know you haven't heard any of the evidence in this case, but at this point if you found

the defendant guilty of murder, you would be more apt to vote for the death penalty than life imprisonment at this point?

A: Yes. At this point, hearing no evidence.

Q: All right. So, then you are assuring the Court that you wouldn't just because someone is found guilty of murder automatically vote for the death penalty, because that is not what the law is. The law is you have to weigh the aggravating circumstances, number one. And, number two, you are also assuring the Court that there are instances where you would consider the death penalty where only one person's life was taken?

A: Correct.

### 4. Randall Hemphill

Q: So you would automatically vote for the death penalty in that case?

A: If it was just out and out murder, yes, sir.

Q: Even though the crime itself might justify the penalty, death penalty, would you be willing to not automatically give that penalty until you heard all the other facts?

A: Yes, sir.

Q: ...the law is that even though that may be so, that still there has to be other evidence heard before you are able to give the death penalty under the law...would you be willing to follow that kind of law?

A: Yes, sir.

¶33. Tanner asserts the court erred by not dismissing these four jurors, specifically claiming that these jurors would automatically vote for the death penalty. After reviewing the record, however, all four jurors said they would follow the law requiring them to weigh the aggravating and mitigating circumstances. "The mere fact that a prospective juror admits that his or her verdict may be affected by the possibility of the death penalty is not a constitutionally permissible justification for sustaining a challenge for cause." *Jones v. State*, 461 So. 2d 686, 691 (Miss. 1984). No juror here stated they would only vote for the death penalty. Instead all four stated they would follow the law and set aside their personal beliefs. "Voir dire is conducted under the supervision of the court, and great deal must, of necessity, be left to its sound discretion." *Ballenger v. State*, 667 So. 2d 1242, 1250 (Miss. 1995). Therefore, we find no reversible error in the trial court's denial of Tanner's challenges for cause.

### IV.

### WHETHER THE LOWER COURT ERRED IN ALLOWING EVIDENCE OF A "STOLEN GUN"

¶34. Tanner argues that the trial court erred by overruling Tanner's motion in limine to exclude testimony regarding Tom Harper's firearm, which had been stolen in December or January, 1997. The basis of Tanner's objection was there was no proof the stolen gun was the murder weapon or that Tanner was even the person who stole it. Additionally, he contends this was evidence of a crime totally unrelated to the

murder and that the "stolen gun theory" was more prejudicial than probative. The trial court thereafter admitted Harper's testimony. Although this Court agrees that evidence of the gun should not have been admitted, we do not find this error requires reversal.

¶35. Harper saw Tanner at East Side Auto Sales in December or January of 1997. Harper, Tanner, and Sam Ray ("Sam") engaged in a conversation. During that conversation, Harper testified that Tanner asked Sam if he could borrow a pistol to hunt snakes and frogs. Sam replied that his pistol was locked up, but informed Tanner that Harper's pistol was in a desk drawer at Harper's camp. Harper later discovered that his gun was missing from the drawer. Harper also testified that he was unsure as to exactly when he found the gun missing.

¶36. There was no evidence presented that Harper's gun was the actual murder weapon. Harper himself testified that the trailer where the gun was kept was always unlocked. Additionally, Harper testified that he initially thought someone else took the gun. Taking the above testimony into consideration, we find sufficient evidence was presented that would rebut any prejudicial effect this testimony had upon the jury. The trial testimony clearly indicated that the gun theory was merely possibility and not fact.

¶37. Although we agree it was error to admit such testimony, we do not find that the testimony harmed Tanner's defense. At most, the testimony entered was harmless error. In *Thomas v. State*, 711 So. 2d 867, 872 (Miss. 1998), this Court discussed the basic test for harmless error, wherein we stated, "the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether the error was unimportant in relation to everything else the jury considered on the issue in question." In the present case, the error was unimportant in relation to everything else presented. Accordingly, we find this issue to be without merit.

## V.

## WHETHER THE LOWER COURT ERRED IN ALLOWING THE TESTIMONY OF AUSTIN SHADDIX

¶38. Tanner argues that Shaddix's testimony was an unfair surprise which prevented Tanner from properly preparing for trial. Tanner further claims that he did not receive adequate notice of the State's intent to use Shaddix as a witness. Furthermore, Tanner points out "that this case was based entirely on circumstantial evidence, until the testimony of the surprise witness."

¶39. According to Shaddix's testimony, sometime in July of 1997, Tanner told Shaddix that he killed Wood. In October of 1997, Shaddix's conscience began to bother him, and he asked his wife to contact the State. On October 3, 1997, at 4:27 p.m., the State informed Tanner about Shaddix, where he was located, and the substance of his testimony. According to Tanner, however, the State subsequently said they were not going to call Shaddix as a witness. On Friday afternoon (of the week preceding the trial), the State once again informed Tanner that Shaddix was a potential witness. On Monday, October 12, 1997, the State informed Tanner that Shaddix would be called as a witness the next morning. A hearing was held on Tanner's motion, where Tanner objected to Shaddix testifying, specifically noting that he had not received a copy of Shaddix's statement, his criminal record, or information regarding whether Shaddix had received any promises in exchange for his testimony.

¶40. The trial court held that Tanner was entitled to speak with the State's investigator, Doc Thaggard.

Thaggard said there was no written statement, but that he did have some written notes from his interview with Shaddix. The trial court held that Tanner was entitled to receive those notes and recessed until the next day. Tanner was also provided with a copy of Shaddix's criminal history late Monday afternoon, the day before Shaddix's testimony. According to Tanner, the criminal record "was in coded form" and not useful. Tanner further asserts they were unable to speak with Shaddix, since he was following the advice of counsel for an unrelated burglary charge.

¶41. Rule 9.04 of the Uniform Circuit and County Court Rules sets forth the appropriate procedures and remedies for the trial court to consider when evaluating discovery violations. Rule 9.04I provides in relevant part as follows:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness...
>
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.

¶42. Tanner was not unfairly surprised or unduly prejudiced in the present case. Tanner was notified at least 10 days prior to Shaddix's testimony that Shaddix was a potential witness. Although there was some dispute regarding whether the State later told Tanner Shaddix would not testify, Tanner was still given an extra day to gather the information he had yet to receive. First, since Shaddix was represented by counsel, Tanner would have been unable to interview the witness at any point. Second, there was no written statement for Tanner to receive. Third, Tanner was given an extra day to review Thaggard's written notes and discuss the case with him. Finally, Tanner failed to request a continuance, mistrial, or inform the court he was unfairly surprised or unduly prejudiced before Shaddix testified on October 13, 1997. The trial court gave Tanner an extra day to speak with Thaggard. Tanner had the duty to inform the trial court that he did not have adequate time to meet the evidence and request a further continuance. Therefore, this Court finds the trial court did not err by allowing the testimony of Austin Shaddix.

## VI.

## WHETHER THE LOWER COURT ERRED IN LIMITING THE CROSS-EXAMINATION OF AUSTIN SHADDIX

¶43. Tanner asserts the trial court erred by prohibiting Tanner from questioning the prosecution's chief witness, Austin Shaddix, about whether he made a deal with the prosecution in exchange for his testimony. Tanner further asserts that, although he testified to the contrary, Shaddix did receive favorable treatment in exchange for his testimony.

¶44. "When a witness has entered into an agreement with the State which guarantees his immunity or leniency in exchange for his testimony, that agreement is a proper subject for cross-examination." *Foster v. State*, 508 So.2d 1111, 1114 (Miss. 1987). Although Tanner asserts that he was prohibited from questioning Shaddix about whether he made a deal with the State in exchange for his testimony, a careful

review of the record suggests otherwise:

Q: ...I understand there is no deal on the table, so I am not trying to misrepresent that; Is that right?

A: That's right.

Q: You said you are just hoping for a deal; is that right?

A: I really haven't even got their say that I have got any hope.

Tanner was further allowed to question Shaddix regarding the length of time he would remain in jail without a deal from the State. Tanner also asked Shaddix about his past criminal history, which included crimes for dishonesty, receipt of stolen goods, and possession of controlled substances. Based upon those questions, the jury was well informed and briefed on the possible motives behind Shaddix's testimony. Therefore, Tanner's argument that his cross-examination of Shaddix was limited is without merit.

¶45. Tanner further asserts that Shaddix, contrary to his testimony at trial, did receive favorable treatment from the State. In support of his argument, Tanner includes the following language from the transcript of Shaddix's hearing in his record excerpts:

The Court: Any statement you would like to make to the Court?

Mr. Klotz: Yes, sir, Judge, just an explanation of why we're here. Mr. Shaddix testified in Bo Tanner's murder case. He was one of the main witnesses on the State's behalf. He's now in protective custody because of that. He's been in protective custody, and Tommy Mayfield and I have talked extensively about Mr. Shaddix's case, and he was the one who made the recommendation in the case. And that's how we have arrived at this particular plea offer in this particular case.[2]

¶46. Consequently, the court released Shaddix as a non-habitual offender with the remaining nine years and six months of his sentence suspended. Prior to his hearing, Shaddix was serving a twenty-five year term as an habitual offender with no possibility of parole.

¶47. This Court has repeatedly held that "[t]his Court will not consider matters which do not appear in the record and must confine itself to what actually does appear in the record." *Medina v. State*, 688 So.2d 727, 732 (Miss. 1996). "Moreover, we cannot decide an issue based on assertions in the briefs alone; rather, issues must be proven by the record." *Id.* In the present case, there is no information contained within the record itself that indicates Tanner received favorable treatment by the State in exchange for his testimony. In effect, Tanner is arguing matters which are outside the appellate record, and therefore, can not be considered by this Court. Therefore, Tanner's argument that the State misrepresented a deal to the jury is without merit.

## VII.

### WHETHER THE LOWER COURT ERRED IN LIMITING THE CROSS-EXAMINATION OF STATE'S INVESTIGATOR

¶48. Tanner asserts that the trial court erred by limiting his cross-examination of Detective Brent Winstead as to his theory of the case. Specifically, Tanner argues the court erred by not allowing Tanner to question Winstead about a white truck that was seen by a neighbor at Wood's house on the night of the murder.

Tanner further maintains that Winstead centered his case around Tanner because he thought Tanner owned a white truck.

¶49. The State, however, contends that the court properly sustained the objections upon the grounds of hearsay. The State further maintains that all information Tanner sought could have been properly put before the jury through the witnesses which had been subpoenaed. This Court agrees and finds Tanner's assertions that the court erred in limiting cross-examination of Winstead to be without merit.

¶50. As stated previously, "relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court will reverse only where that discretion has been abused." *Underwood*, 708 So. 2d at 31. Here, Tanner was questioning Detective Winstead as to what he had been told by the neighbor, Rosemary Scheuerman. Such testimony would be hearsay and is prohibited by Rule 802 of the Mississippi Rules of Evidence. In fact, Tanner was allowed to question Scheuerman, and elicited the following response:

> Q: Now, let me back up just a moment. The person- first of all, the vehicle that pulled in behind Mrs. Woods, was it behind her or was it partially obscured by her vehicle?
>
> A: It was partially obscured by her vehicle.
>
> Q: Could you tell what kind of vehicle it was?
>
> A: No. I jump to conclusions, and I jumped to conclusions on that vehicle....

Further, outside of the jury's presence, Tanner was allowed to question Detective Winstead about the white truck and the significance he placed on the white truck.

> Q: Detective Winstead, what, if any, significance did you attach to a white pickup truck in your investigation of this capital murder case?
>
> A: That Boman Tanner owned a white pickup truck.
>
> Q: Why was that significant?
>
> A: At one time Rosemary Scheuerman said that there was a white pickup pulled in next to Verna Wood's car.
>
> ****
>
> Q: Have you since, I mean, is that one of the reasons why you thought Bo Tanner was a suspect because he owned and drove a white pickup truck?
>
> A: That was one of the reasons.
>
> Q: Since then you subsequently learned that he did not own a white pickup truck; is that correct?
>
> A: Right.

Although the truck may have been an initial factor in Tanner's becoming a suspect, it was not the sole factor. Tanner was not arrested until the police discovered he sold Wood's missing diamonds to a pawn shop. The

testimony concerning the truck was a minor point and was not the central or deciding factor surrounding Tanner's arrest. Consequently, Tanner's assertion that the court erred by limiting his cross-examination as to Detective Winstead's theory of the white truck is without merit.

¶51. Tanner also asserts that the court erred by not allowing him to cross-examine Detective Winstead about the time of Wood's death. At the preliminary hearing, Winstead testified that the time of death was approximately 5:00 p.m. At trial, however, the State provided testimony of a pathologist, Dr. Galvez, that the time of death was between 2:00 and 8:00 p.m. Outside the presence of the jury, Tanner was allowed to question Winstead about why he said the time of death was 5:00 p.m. at the preliminary hearing. Winstead responded that his testimony at the preliminary hearing was based solely on Coroner Robert Martin's report, which placed the time of death at 5:00 p.m. At trial, Robert Martin testified as to why he put down 5:00 p.m. as follows:

Q: What time did you put there?

A: 1700, which is 5 p.m.

Q: All right.

A: And I may explain that I always say approximately, but the computer does not have a thing to put the plus or minus...

Q: A pure approximation?

A: Right.

****

Q: Is the time of death the determination that you referred to a while ago that the pathologist has the final say so, medically speaking.

A: Yes.

****

Q: I think you said that you put down five o'clock p.m. was time of death, Coroner Martin?

A: Yes, sir, in my opinion.

Q: What did you base that on.

A: Several things. In talking with family, and so forth, I understand that Mrs. Wood had gone to a dentist, and I believe left there about 3:30, or so. And in my estimation I was allowing for time if she had stopped at a store or gas to get home. And the other thing was that she apparently had on the same clothing she had at the dentist office. And in my experience, I find that most women tend to change clothes when they get home. So from the time she left the dentist office, and taking into consideration maybe traffic, maybe stopping for gas, or a store, whatever, coming into the house. I understand there was some food laid out looked like to be prepared for a meal, doing that and then maybe to change clothes, and that was what I was going by, plus the condition of the body.

Martin's testimony clearly indicates that his time of death was only an approximation based on what he had been told by family and friends. At the preliminary hearing, Winstead testified the time of death was 5:00 p.m. This testimony was based solely on Martin's report because the pathology report was not yet available. Although, Tanner has an alibi at 5:00 p.m. the day Wood was killed, the testimony, taken as a whole, conclusively holds that Wood was sometime killed between 2:00 and 8:00 p.m. A narrower determination can not be made, and Tanner suffered no harm by not being able to cross-examine Winstead about his contradiction in testimony in front of the jury. The jury heard the testimony of Martin as to why he placed the time of death at 5:00 p.m. and also heard the testimony of Scheuerman, who said she saw Wood between 4:20 and 4:35 p.m. Consequently, the court did not abuse its discretion, and this issue is without merit.

## VIII.

### WHETHER THE LOWER COURT ERRED IN NOT GRANTING A MISTRIAL DUE TO PROSECUTORIAL MISCONDUCT

¶52. "In appropriate circumstances, prosecutorial misconduct has been the basis for reversal of a defendant's conviction and sentence." *Chase v. State*, 645 So.2d 829, 853 (Miss.1994). However, in discussing the broad latitude afforded attorneys in making their closing arguments, this Court has stated:

> Counsel was not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record.

*Brown v. State*, 690 So.2d 276, 296 (Miss. 1996)(quoting *Johnson v. State*, 416 So.2d 383, 391 (Miss.1982)). Indeed, we have held that "the prosecutor may comment on facts in evidence and may draw proper deductions there from." *Id.*

¶53. In the present case, Tanner asserts that District Attorney Ed Peters repeatedly made improper speaking objections and derogatory comments in the presence of the jury which prejudiced Tanner in the eyes of the jury. Specifically, Tanner refers to the following instances:

> [Mr. Peters] Your honor, it doesn't matter what the answer is. He just wants to make a statement. He doesn't care what this witness says.

> [Mr. Peters] Every time you sustain an objection, then he makes the statement that he wants the jury to believe with no proof. And we ask that he be instructed to quit doing that. If he has got proof let me put it on.

> [Mr. Peters] ...Until then we ask that he quit asking speculative questions for no purpose other than to throw smoke screen into this case.

> [Mr. Peters] If he has got evidence that he wants to put on, we ask that he put it on and not try to avoid those people being cross examined by trying to ram in hearsay, and we object.

> [Mr. Peters] Your honor, absolutely, we object to it. We ask that he get sanctioned...that is absolutely uncalled for.

[Mr. Peters] If it please the Court, if Mr. Malouf has any proof whatsoever of a deal, we ask that he come forward with it at this time; otherwise, that he refrain from asking those questions.

[Mr. Peters] Can we excuse the jury. This is the second time we have had discovery problems.

¶54. Where a prosecutor has made an improper argument, the question on appeal is "whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Wells v. State*, 698 So.2d 497, 507 (Miss. 1997). This Court has looked at the instances of alleged prosecutorial misconduct and does not find them to be serious enough to warrant reversal. In the most serious instances, the trial judge either excluded the jury, asked Tanner's counsel to rephrase the question, or sustained Tanner's objections.

¶55. Additionally, Tanner asserts that he was prejudiced by the State's repeated remarks that he "put on the proof." However, a review of the record indicates that the State merely was seeking an explanation of why such questions were relevant to the issue at trial. "The decision to declare a mistrial is within the sound discretion of the trial judge." *Brent v. State*, 632 So.2d 936, 941 (Miss. 1994). "To find error from a trial judge's failure to declare a mistrial, there must have been an abuse of discretion." *Id.* Although the State's comments were somewhat inappropriate at times, this Court finds no such instance where the State's comments were severe enough to prejudice the ultimate decision of the jury. Therefore, this Court finds the trial court did not err in denying Tanner's motion for mistrial based upon prosecutorial misconduct.

## IX.

## WHETHER THE LOWER COURT ERRED IN ALLOWING THE PROSECUTION TO ASK LEADING QUESTIONS

¶56. Tanner asserts that the trial court erred in repeatedly allowing the prosecution to ask witnesses leading questions. The State, however, contends that many of the questions were on redirect and simply rebutted or clarified facts developed on cross-examination. The State further asserts that the Court instructed the State to rephrase its questions on numerous occasions, and that Tanner has failed to show exactly how he was prejudiced or harmed as a result. We agree and find this issue to be without merit.

¶57. Tanner specifically refers to the following instances:

Q: Did the fact that he got caught selling the diamonds have anything to do with him becoming a suspect?

A: Yes, it most definitely did.

Q: Now, Mrs. Taylor, during the time you knew Mrs. Wood, when she would dress to go out somewhere, did you ever know her to go out anywhere without wearing this engagement ring?

A: No, sir.

¶58. In *Clemons v. State*, 732 So. 2d 883, 889 (Miss. 1999), this Court defined a leading question as follows:

A leading question is one that suggests to the witness the specific answer desired by the examining

attorney. Trial courts are given great discretion in permitting the use of such questions, and unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision. This is because the harm caused is usually inconsiderable and speculative, and only the trial court was able to observe the demeanor of the witness to determine the harm.

"To justify a reversal because of the allowance of a leading question, not only is it necessary that there should have been a manifest abuse of discretion, but it is also necessary that the question shall have influenced the answer and that injury resulted." *Palmer v. State*, 427 So.2d 111, 115 (Miss. 1983).

¶59. In the first instance, Detective McCann was being asked on redirect whether the stolen diamonds had anything to do with Tanner becoming a suspect. During cross-examination of Detective McCann, Tanner had asked McCann if he became suspicious when Tanner informed him that his fingerprints would be on Wood's safe. The present case is similar to *Clemons*. In *Clemons*, this Court noted that a leading question may be used to rebut an implication made on cross-examination and to further develop a witness's testimony. 732 So. 2d at 889. Accordingly, the trial court did not err by allowing the State to ask Detective McCann if the diamonds were a reason Tanner became a suspect.

¶60. In the second instance, the State, on direct examination, was asking Mrs. Taylor, a friend of the victim, if she had ever known Wood to leave her house without wearing her engagement ring. This question was not leading and merely called for a yes or no answer. There was no suggestion by counsel as to how the witness should respond, and Tanner suffered no injury as a result. Therefore, Tanner's assertion that he was prejudiced by the State's asking leading questions is without merit.

## X.

## WHETHER THE LOWER COURT ERRED IN ALLOWING HEARSAY

¶61. The Mississippi Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). Hearsay is not admissible except as provided by law. M.R.E. 802. Furthermore, this Court has previously stated that "if the significance of a statement is simply that it was made and there is no issue about the truth of the matter asserted, then the statement is not hearsay." *Mickel v. State*, 602 So.2d 1160, 1162 (Miss.1992).

¶62. Tanner asserts that the trial court erred by improperly admitting hearsay evidence. Tanner specifically asserts that the following four situations were prejudicial.

A.

¶63. The prosecution asked Mrs. Sain on direct examination:

Q: Listen to my question. Did she ever tell you or express to you at any time, particularly the weeks and months immediately before her death, did she ever tell you that either or both of those rings had been stolen, missing or otherwise appropriated from her?

A: No.

¶64. Tanner objected stating it was "hearsay," and the trial court subsequently overruled his objection. We

disagree with the trial court. The above testimony was hearsay. It was an oral assertion, as defined by M.R.E. 801(a), and was offered into evidence for the truth of the matter asserted. Although this Court finds the question asked by counsel was improper, we conclude such error was harmless and did not prejudice Tanner.

## B.

¶65. The prosecution asked Detective McCann on direct examination:

Q: Did you obtain a description from Mrs. Wood's executor of items that he had reported missing that belonged to her?

¶66. The above testimony is not hearsay. The State simply asked whether Detective McCann obtained a description of items from the executor. Therefore, this issue is without merit.

## C.

¶67. The prosecution asked Detective Winstead on direct examination:

Q: As a result of your investigation, your inspection of the scene, and your conversation with the family and friends of Mrs. Wood, did you develop- did you develop a motive as the theory of your case, and if so, what was it?

A: Robbery.

¶68. Tanner objected, stating "he is asking for hearsay when he is saying, what your investigation, what others told you." This Court disagrees. The above testimony is not hearsay. Rather, the State simply asked Detective Winstead if he developed a motive and what the motive was. Therefore, this issue is without merit.

## D.

¶69. The prosecution asked Detective McCann on direct examination:

Q: That night, that is, the night y'all first began to treat it as a homicide. Do you know whether Detective McCann spoke with any neighborhood people?

A: He did. He spoke with the persons in the neighborhood who were standing out in front of the house and he came back in and he said that something struck him as strange.

¶70. When Tanner objected based on hearsay grounds, the trial court stated, "try to avoid hearsay." Although it did not per se sustain the objection, the trial court's language implied such. The information received from the testimony above had already been introduced through Detective McCann's testimony of what he said that night. Consequently, Tanner was not prejudiced by the admission of this hearsay. While this Court agrees the above testimony is inadmissible hearsay, we find such error to be harmless.

## XI.

## WHETHER THE LOWER COURT ERRED IN ALLOWING IMPROPER REDIRECT BY THE PROSECUTION

¶71. Tanner asserts that the trial judge committed reversible error by admitting evidence on re-direct that had not been discussed on direct or cross-examination. "The trial court has broad discretion in allowing or disallowing redirect examination of witnesses." *West v. State*, 463 So.2d 1048, 1055 (Miss.1985). Furthermore, we will not disturb a trial court's ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion. *Blue v. State*, 674 So.2d 1184, 1212 (Miss. 1996).

¶72. In the present case, Tanner specifically sets forth four instances where he alleges the State was allowed to introduce testimony on redirect that had not been previously discussed in direct or cross-examination.

A.

¶73. The prosecution asked Detective McCann during redirect:

> Q: Now, counsel asked you what made this defendant a suspect in this case.
>
> A: Yes.
>
> Q: Did the fact he got caught -

¶74. Tanner asserts the above testimony was improper redirect. This Court disagrees. During cross-examination, Tanner's counsel asked whether he was considered a suspect at the time he informed the police his fingerprints were on Wood's safe. Since Tanner had inquired as to when Tanner became a suspect in this case, it was not improper redirect for the prosecution to inquire on the same topic during redirect. Accordingly, this issue is without merit.

B.

¶75. The prosecution asked Detective McCann during redirect:

> Q: Is there anything to tie any of the suspects in any of those other cases to the murder of Verna Wood?
>
> A: No, there is not evidence of that.

¶76. Tanner asserts that he was prohibited on cross-examination from asking about "other suspects that had admitted to killing at least four people" in the area near Wood's home. While this is true, Tanner was allowed to question Detective McCann as to whether there had previously been similar crimes in this area. He was also allowed to ask when those crimes took place. On redirect, the State asked if there was anything to tie the crimes mentioned on cross-examination to the present case. The trial court then denied Tanner's request for follow-up questions.

¶77. This Court concludes that the State's redirect was proper. The trial court simply forbid Tanner from going into the details of the other crimes, but did not prevent him from putting the information before the jury. Likewise, the State did not go into any details surrounding the crimes, but only asked if there had been any connection between those and the present case. Therefore, the redirect was proper and this issue is without merit.

C.

¶78. The prosecution asked Mr. Thomas Story about the numerical sequence of a missing check of Wood and Tanner's counsel responded:

> [Mr. Malouf]: That's what I'm saying. I understand. I did not get into the sequence of the checks, therefore, it is not proper redirect for him to do so.

¶79. Tanner asserts that since he did not go into the sequence of the checks during cross-examination, that the trial court erred by allowing the State to ask if the highest numbered check was made out to Orkin Pest Control on the date Wood died. Outside the presence of the jury, Tanner explained that Wood did not write checks in sequential order and that he did not address this issue during cross-examination. However, Tanner did extensively go through the checks and check numbers during cross-examination. Although Tanner may have not specifically used the term "sequence," he did refer to the check numbers and specifically referred to the check and number in dispute. Consequently, it was not error for the State to ask if the highest number missing from the checkbook was written on the same day Wood died. Therefore, this issue is without merit.

D.

¶80. The prosecution asked Detective McCann during redirect:

> Q: Detective Winstead, do you know of any person - do you, Brent Winstead, know of any person in this universe other than Boman Tanner who got caught selling Verna Wood's jewelry the afternoon she was killed?

¶81. Once again, Tanner asserts that the above testimony was not addressed on cross-examination. However, a review of the record, shows that the issue of Tanner selling the diamonds had been discussed on at least three other occasions during cross-examination. The trial court has broad discretion on matters of redirect, and, absent an abuse of discretion, its decisions will not be overturned. *Blue*, 674 So. 2d at 1212. Accordingly, this Court concludes the redirect was proper and finds this issue to be without merit.

**XII.**

**WHETHER THE VERDICT OF GUILTY IS SUPPORTED BY SUFFICIENT CREDIBLE EVIDENCE**

¶82. Tanner asserts that there is uncontroverted evidence that Tanner was in a jewelry store at the same time Wood's neighbor saw her followed by a man into her house. Furthermore, Tanner argues that this uncontroverted evidence precludes a verdict of guilty. The State, in return, asserts the record supports the charge of capital murder.

¶83. The standard of review for the legal sufficiency of evidence is well settled:

> [W]e must, with respect to each element of the offense, consider all of the evidence--not just the evidence which supports the case for the prosecution--in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters

regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Gleeton v. State*, 716 So. 2d 1083, 1087 (Miss. 1998). Furthermore, factual disputes are properly resolved by a jury and do not mandate a new trial. *McNeal v. State*, 617 So. 2d 999, 1009 (Miss. 1993). "[When] there is substantial evidence consistent with the verdict, evidence which is of such weight and quality that, keeping the burden of proof beyond a reasonable doubt in mind, "fair-minded" [jurors] in the exercise of impartial judgment might reach different conclusions, the jury's verdict should be allowed to stand."*Ashford v. State*, 583 So. 2d 1279, 1281 (Miss. 1991).

¶84. In the present case, sufficient evidence was presented to the jury to support a conviction of guilty. On March 5, 1997, the day Wood was killed, Tanner lost approximately $3,000 at a casino. Phone records indicate Tanner was in his house at 3:35 p.m. that same day. Further testimony at trial also placed Wood returning home sometime shortly after 3:30 p.m. Shaddix testified that Tanner told him he followed Wood into her house, killed her, and took her rings. Wood's neighbor also testified she saw someone follow Wood into her house that day between 4:20 and 4:35 p.m. Tanner, however, contends that he has an alibi and presented witnesses who testified he was in a jewelry store in Pearl, Mississippi, from approximately 3:55 to 4:40 p.m. Police later discovered that Tanner had taken and sold Wood's rings to a pawn shop. Tanner subsequently confessed to taking the rings "two or three weeks" earlier but maintained he did not kill Wood. Testimony by Wood's housekeeper, however, indicates that she helped Wood recover one of the rings Tanner pawned from a recliner on the morning of Wood's death.

¶85. Taking all factors into consideration, a reasonable juror could have concluded that Tanner was indeed guilty. "It is enough to say that the jury, and not the reviewing court, judges the credibility of the witnesses as well as the weight and worth of their conflicting testimony." *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980). Accordingly, sufficient credible evidence was presented to the jury, and Tanner's argument is without merit.

## XIII.

## WHETHER THE AGGREGATE ERROR REQUIRES REVERSAL

¶86. Tanner argues that the cumulative effect of the errors in trial denied him his constitutional right to a fair trial. "This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal." *Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss. 1992). We find this issue to be without merit.

## CONCLUSION

¶87. With the exception of its handling of the *Batson* challenge to the State's peremptory strikes of prospective jurors Kasenda Lampkin and Kimberly Cain, we affirm the judgment of the Hinds County Circuit Court. However, we remand this case to that court with directions that it conduct a *Batson* hearing on the State's peremptory strikes of those two prospective jurors and that it rule on whether the State struck either of those prospective jurors for racially discriminatory reasons. If the trial court finds that the State struck either or both of those prospective jurors for racially discriminatory reasons, then the trial court

shall vacate its judgment and order a new trial for Boman L. Tanner. In remanding for this **_Batson_** hearing, we do not express or imply any view as to how the trial court should rule on remand.

¶88. **AFFIRMED IN PART AND REMANDED.**

> **PITTMAN, P.J., SMITH, COBB AND DIAZ, JJ., CONCUR. PRATHER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., AND WALLER, J. McRAE, J., NOT PARTICIPATING.**

> **PRATHER, CHIEF JUSTICE, DISSENTING:**

¶89. Because I feel the trial court erred in admitting testimony of an allegedly stolen gun, I respectfully dissent. "Relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court will reverse only where that discretion has been abused." **_Underwood v. State_**, 708 So. 2d 18, 31 (Miss. 1998). Tanner asserts that the trial court erred by overruling his motion in limine to exclude testimony regarding Tom Harper's firearm, which had been stolen in December or January, 1997. The basis of Tanner's objection was there was that no proof the stolen gun was the murder weapon or that Tanner was even the person who stole it. Furthermore, Tanner asserts this was evidence of a crime totally unrelated to the murder, and that the "stolen gun theory" was more prejudicial than probative. After hearing Tanner's objections, the trial court admitted Harper's testimony.

¶90. According to Harper's testimony, Harper saw Tanner at East Side Auto Sales in December or January of 1997. Harper, Tanner, and Sam Ray ("Sam") engaged in a conversation. During that conversation, Harper testified that Tanner asked Sam if he could borrow a pistol to hunt snakes and frogs. Sam replied that his pistol was locked up, but informed Tanner that Harper's pistol was in a desk drawer at Harper's camp. According to Harper, his pistol turned up missing the same day this conversation took place. On cross-examination, however, Harper could not say exactly what month the gun was stolen and agreed he had previously stated it had been missing since September or October. Furthermore, Harper testified he did not see the gun each time he opened the door because it was covered by a watch cap. Harper also testified that he noticed truck tracks near his camp on the day he found the gun missing and that Tanner was driving a white pick-up truck at that time.

¶91. The gun stolen from Harper was a .32 Smith and Wesson long Remington. This is the same type of gun that killed Wood. It was loaded with lead ball ammunition in S and S long format with a plain bullet. John Dial testified as an expert in firearms identification. Dial testified that .32s are very common and could be purchased at any number of places in the Jackson area. He further testified that there were "at least thousands" of .32s in Jackson. Dial also testified that the murder weapon was of "good quality", appeared to be in "good shape", and did not appear to be "rusted or pitted." Harper, however, testified that his gun was at least 18-20 years old, had never been maintained, and was rusty.

¶92. "Evidence of prior offenses committed by a defendant, not resulting in a conviction, is generally not admissible either for impeachment purposes or as a part of the State's case in chief." **_Underwood_**, 708 So. 2d at 32; *see also* **Gossett v. State**, 660 So. 2d 1285, 1291 (Miss. 1995). It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Miss. R. Evid. 404(b). Furthermore, "proof of a crime is admissible where the offense charged and that offered to be proved is so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences." **_Underwood_**, 708 So. 2d at 32. If a

prior bad act does fall within a Rule 404(b) exception, its prejudicial effect must still be weighed against its probative value to determine admissibility. *Id.*

¶93. In the present case, Tanner had never been arrested, indicted for or convicted of stealing Harper's gun. Harper, himself, testified that he thought "Chuck took the gun at first." Harper's trailer was kept unlocked, and many people had access to his camp. There was no eyewitness testimony to confirm Tanner took the gun or ever had the gun in his possession. The only proof offered by the State was the testimony of Harper who said he heard a friend tell Tanner where the gun was located.

¶94. Furthermore, the State failed to identify exactly when the gun was stolen. Harper first told detectives the gun was stolen in the "first part of December". He testified at trial that the gun may have been stolen in "the last part of January or first of February". However, during cross-examination, Harper agreed that he had previously stated the gun had been missing since September or October. The only time frame Harper was sure about was that it was "cold weather" when the gun was stolen. "The lack of at least an approximate time frame completely ignores Mississippi Rules of Evidence 401 and 403 as to relevancy and misleading the jury." *Bounds v. State*, 688 So.2d 1362, 1371 (Miss. 1997). The lack of a time frame would also seem to allow any bad act, committed at any time, by a defendant to place him in a bad light in front of a jury, which is exactly what the Rules of Evidence seek to prevent. *Id.*

¶95. In the present case, the time when the gun was stolen is of great importance. Tanner moved into his house in the latter part of January or early part of February. Without knowing when the gun was taken, the question is then raised as to whether Tanner even knew Wood at the time he allegedly took the weapon. If he did not know Wood at the time the gun was taken, it could hardly be said that Tanner took the gun for the purposes of motive, opportunity, intent, preparation or plan.

¶96. Furthermore, there was no evidence presented at trial to prove Harper's gun was the actual murder weapon. The State provided nothing more than mere suspicion by presenting testimony that Tanner could have stolen a gun and that the gun could have been the murder weapon. There was no evidence presented that Tanner took Harper's gun or that Harper's gun was used to kill Wood. Furthermore, the State failed to identify exactly when the gun was even taken. By allowing this testimony, an inference was made, without any supporting evidence, that Tanner was a thief and a killer. Harper's testimony was clearly more prejudicial than probative and resulted in Tanner being denied a fair trial. Accordingly, the trial court abused its discretion by admitting Harper's testimony about the allegedly stolen gun, and this abuse of discretion deprived Tanner of his right to a fair trial. This case should be reversed and remanded for a new trial.

¶97. For these reasons, respectfully, I dissent.

**BANKS, P.J., AND WALLER, J., JOIN THIS OPINION.**

1. Tanner originally gave a different accounting of his activities when first questioned by the police. He stated that he went to the Isle of Capri Casino. He lost $300 and left the casino around 3:30 or 4:00 p.m. He then picked up his wife at the reservoir at 5:00 p.m.

2. Tommy Mayfield (who made the recommendation to release Shaddix on a suspended sentence as a non-habitual offender), and District Attorney Ed Peters, were the prosecutors in the present case.